NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0435n.06
Filed: July 21, 2008

No. 07-3671

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALKET SULAJ, | ) | |
| | ) | ON PETITION FOR REVIEW |
| *Petitioner*, | ) | OF A DECISION OF THE |
| | ) | BOARD OF IMMIGRATION |
| v. | ) | APPEALS |
| | ) | |
| MICHAEL B. MUKASEY, ATTORNEY | ) | **O P I N I O N** |
| GENERAL OF THE UNITED STATES, | ) | |
| | ) | |
| *Respondent.* | ) | |

BEFORE:     COLE and CLAY, Circuit Judges; and RUSSELL, District Judge.[*]

**COLE, Circuit Judge.** Petitioner Alket Sulaj, a native and citizen of Albania, petitions this Court for review of a final order of the Board of Immigration Appeals ("BIA"), affirming an immigration judge's decision to deny him asylum, withholding of removal under the Immigration and Nationality Act, and protection under the United Nations Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment. Because we find no merit to Sulaj's contentions, we **DENY** his petition.

## I. BACKGROUND

On December 16, 2001, Petitioner Alket Sulaj illegally entered the United States near Laredo,

_____

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

Texas, and was taken into custody by the Immigration and Naturalization Service[1] ("INS") shortly after he boarded a bus headed to Houston. INS initiated removal proceedings against Sulaj on December 17, 2001 by referring his case to an immigration judge regarding asylum and related remedies, pursuant to 8 C.F.R. § 208.2(b), as well as issuing him a Notice to Appear before the INS, citing his violation of § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA") for being present in the United States without being lawfully admitted. *See* 8 U.S.C. § 1182(a)(6)(A)(i).

On October 30, 2002, Sulaj appeared with counsel before Immigration Judge Elizabeth A. Hacker ("IJ") in Detroit, Michigan. During the proceedings, Sulaj acknowledged receipt of the Notice to Appear, conceded the factual allegations and charges of removability contained therein, and submitted an application for asylum, withholding of removal, and protection under the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), averring persecution on the basis of his political opinion and association with the Democratic Party of Albania. Sulaj testified under oath that his counsel had reviewed the asylum application with him and that he agreed with its contents. The IJ informed Sulaj of the consequences of knowingly filing a frivolous application and then continued the removal hearing for a later date.

The hearing was set for nearly three years later on October 19, 2005. When the hearing convened, Sulaj attempted to file a second application for asylum, along with an additional declaration under oath and other supporting documentation. The IJ declined to accept this second application, however, other than as an exhibit to his first application, because Sulaj's purported

---

[1]On March 1, 2003, the functions of the former Immigration and Naturalization Service were transferred from the Department of Justice to three agencies in the newly established Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-926, 116 Stat. 2135 (Nov. 25, 2002).

reason for submitting a second application was that, contrary to his prior representation under oath, his original declaration had not been translated to him in Albanian. The IJ then commenced with the hearing by explaining to Sulaj, for a second time, the consequences of filing a frivolous application.

Sulaj thereupon testified, under oath, to owning his own business in Albania, named Souvenir Abollonia, which sold antiques and various souvenirs. Sulaj further testified to becoming a member of the youth forum of the Democratic Party of Albania in 1996 and subsequently joining the main wing of the Democratic Party in 1997. Sulaj claimed that his troubles began in September of 1998, following the murder of the leader of the Democratic Party. When Sulaj and his political allies attempted to demonstrate against the murder, he asserted that members of the Socialist Party beat him and his companions outside of his store.

Subsequently, on July 1, 1999, Sulaj averred that two Socialist agents entered his store and threatened, punched, and kicked him in retaliation for his activity in the Democratic Party. Sulaj recalled that this incident lasted between ten and fifteen minutes. Despite sustaining injuries, Sulaj testified that he did not seek medical treatment because he feared the potential consequences, including further threats and physical violence. Likewise, Sulaj stated that he did not report the incident to the police because he was afraid such an action would subject him to further danger.

Additionally, between the summer of 1997 and October 2000, when Sulaj testified that he officially closed his store, he testified that "mass groups" entered the premises and terrorized him and his employees. These individuals also took all the money in the store. During one of these raids, Sulaj testified that an anonymous, threatening letter was placed under the door of his shop. Sulaj did not notify the police of this letter because when his father had reported similar incidents in the past,

Sulaj insisted that the police remained non-responsive.

On October 20, 2001, Sulaj stated that a group of unidentifiable attackers brutally beat him and his older brother as they traveled by car to a nearby city. According to Sulaj, the driver of the group forced Sulaj's vehicle to stop. The group then exited their car and, brandishing weapons, began to beat Sulaj and his brother. Sulaj claims that one of the members of the group beat him with a fist in the back of his head. Then, another attacker placed a gun to Sulaj's head. Before they left, several of the individuals reminded Sulaj of the anonymous letter previously delivered to Sulaj's store. Sulaj sustained injuries to his head, stomach, and sides and was later taken to a hospital in the city of Balsh by a group of passers-by. At the hospital, Sulaj received medications for his injuries but was allowed to leave, while his brother remained overnight for further treatment. When the government questioned Sulaj as to the existence of medical records documenting his injuries, Sulaj explained that he brought them with him from Albania but that he did not know their current location. Sulaj also testified that he did not report the attack to the police because the group threatened further violence if he contacted the authorities.

Following this incident, Sulaj concluded that he could no longer live in Albania. He left the country on November 1, 2001, traveling first to Greece, where he had a state permit for a temporary six-month residence. Sulaj remained in Greece for approximately a month and a half. When asked why he did not apply for asylum in Greece, Sulaj explained that he did not feel safe seeking asylum there because the "Greek government does[] [not] have . . . [a] good impression about the Albanians." After departing Greece, Sulaj gained entry to Italy through use of a false Greek passport and remained there for four to five days. Thereafter, he departed for Mexico, where he stayed for

three to four days, and then was smuggled across the border to the United States. When asked whether he was willing to return to Albania, Sulaj stated that he was "more afraid than ever to return to Albania."

Following the completion of testimony, the IJ rendered an oral decision in which she found that Sulaj's application for asylum, withholding of removal, and relief under CAT should be denied. In arriving at this decision, the IJ focused on four factors. First, the IJ emphasized Sulaj's questionable credibility, as reflected by the conflicting statements between his first and second asylum applications. Second, the IJ determined that Sulaj failed to furnish any corroboration for his allegations that he owned a store, possessed a business license, and sold the store after receiving a threatening letter. The IJ further noted that Sulaj failed to proffer medical records regarding his treatment at the hospital in October of 2001, despite his assertion that he had such records in his possession.

As a third ground for denial, the IJ concluded that Sulaj had failed to establish a protected basis warranting relief, specifically that he failed to demonstrate that he was targeted on account of his affiliation with the Democratic Party. Lastly, the IJ determined that Sulaj had failed to present credible testimony that he had suffered past persecution, and that he could not establish a well-founded fear of future persecution on account of his political opinion because, since his departure from Albania, the party he supported, namely, the Democratic Party, had taken control of the government. Thus, the IJ held that the United States had met its burden of establishing changed country conditions, thereby undermining Sulaj's contention that he had a well-founded fear of future persecution at the hands of the Socialists.

Subsequently, Sulaj appealed to the BIA, which affirmed the decision of the IJ on April 25, 2007. The BIA agreed that the evidence Sulaj submitted in support of his application contained numerous discrepancies regarding his alleged past mistreatment in Albania, that he failed to provide reasonably available corroboration regarding his ownership of an antique store and the injuries he allegedly sustained in October of 2001, and that country conditions in Albania had sufficiently changed to rebut his claim of a well-founded fear of future persecution. Sulaj then filed a timely petition for review with this Court on May 24, 2007.

## II. ANALYSIS

### A. Standard of Review

Where the BIA substantially adopts an immigration judge's reasoning and merely supplements the judge's opinion, we look to the immigration judge's decision as supplemented by the BIA's opinion as the basis for review. *Lazar v. Gonzales*, 500 F.3d 469, 474 (6th Cir. 2007). Pursuant to such review, we assess the immigration judge's determination and any additional analysis by the BIA, including adverse credibility findings, under a substantial-evidence standard and will not disturb these findings provided they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); *Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005). We have clarified that an immigration judge's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 252(b)(4)(B)); *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (stating that an asylum applicant must show "that the evidence presented was so compelling that no

reasonable factfinder could fail to find the requisite persecution or fear of persecution"); *Singh v. Ashcroft*, 398 F.3d 396, 402-04 (6th Cir. 2005) (upholding an immigration judge's adverse credibility finding in a "very close case," where substantial evidence supported an immigration judge's reliance on "two key inconsistencies in [the alien's] asylum application and his oral testimony," even though "several of the [other] grounds upon which the IJ relied [were] somewhat questionable"). Notwithstanding the deference we accord decisions rendered by immigration judges, "[w]hen an IJ determines that an alien's testimony lacks credibility, the IJ must include in his or her decision 'specific reasons' explaining why the IJ reached such a conclusion." *Singh*, 398 F.3d at 402.[1]

## B. Sulaj's Asylum Application

On appeal, Sulaj challenges both the finding that his testimony lacked credibility and the denial of his asylum application. We address both arguments in turn.

### 1. Credibility

In asylum proceedings, immigration judges are authorized to consider "all relevant factors," including the petitioner's demeanor, candor, responsiveness, and the consistency and plausibility of the petitioner's testimony and declaration. 8 U.S.C. § 1158(b)(1)(B)(iii); *see also* 8 U.S.C. §

---

[1] Although our jurisdiction arises under section 242 of the INA, 8 U.S.C. § 1252, which was amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 231 (May 11, 2005), our review in the instant case remains unaffected by this statute. The REAL ID Act modified the standards governing credibility determinations, stating that those determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim," *see id.* §§ 101(a), (c) (codified at 8 U.S.C. § 1158(b)(1)(B). These changes, however, do not govern our review of Sulaj's case, because he filed his application in 2002, before their effective date. *See Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006).

1229a(c)(4)(C) (2008) (applying the same credibility test to statements made in a removal proceeding). We treat credibility determinations as findings of fact and therefore review whether there is substantial evidence supporting them. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). While we afford adverse credibility determinations substantial deference, the immigration judge must base such a decision on specific reasons "that go to the heart of the applicant's claim." *Id*. at 926.

In the instant case, the IJ found that there were discrepancies between Sulaj's first and second applications for asylum and that, as a result, Sulaj was not credible. Specifically, the IJ noted that at the initial hearing, she questioned Sulaj, through an Albanian interpreter, as to whether he had reviewed the asylum application with his attorney and agreed with its contents. Sulaj responded affirmatively and swore under oath that the contents of his initial application were true and correct. When submitting his second application, however, Sulaj insisted, contrary to his prior sworn testimony, that he merely signed his initial asylum application without being read its contents.

Additionally, the IJ emphasized that "[t]he new application and statement the respondent submits is considerably different than the first application." In the first application, Sulaj maintained that he received the anonymous threatening letter in October of 2000, but in the second application, he claims that the letter arrived in October of 2001. Moreover, the first application completely omits any reference to Socialist agents raiding his store in 1999, while the second application includes this incident in considerable detail. When the IJ questioned Sulaj as to the details of the incident, Sulaj stated that he was not actually severely beaten or punched, but was simply pushed around by Socialist agents for a few minutes.

Furthermore, as part of his first application, Sulaj stated that his brother was stopped and attacked by unknown individuals in May 2001 while driving his car to a nearby town. In the second application, however, Sulaj insists that he was present with his brother during this incident and that they were both beaten, although his brother admittedly incurred more severe injuries. When questioned about this inconsistency, Sulaj attributed any problems to the Albanian interpreter assisting with the first application. Nevertheless, the IJ found it troubling that "the second application and statement [were] clearly embellished to include [Sulaj] in an incident which allegedly occurred in . . . 2001."

Sulaj is unable to demonstrate that his testimony was credible. Substantial evidence underlies the IJ's and the BIA's finding that the inconsistencies throughout both of Sulaj's applications go to the heart of his asylum petition and render him unworthy of belief. First, as part of his second application for asylum, Sulaj claimed that Socialist agents beat and kicked him at his store in July of 1999 and threatened to kill him because of his affiliations with the Democratic Party. During cross-examination, however, Sulaj conceded that this incident lasted for at most a few minutes. Moreover, when asked whether he was harmed, Sulaj stated, "not much, they did hit me that's the truth . . . ."

Likewise, Sulaj initially testified that, in September of 1998, he participated in a demonstration opposing the assassination of the leader of the Democratic Party and was beaten at the hands of the Socialist police as a result of his actions. But when questioned by the government, Sulaj admitted that he was not arrested during this incident and that "in particular I didn't g[e]t hit."

Finally, Sulaj's applications are inconsistent regarding the incident involving his brother

being stopped by Socialist attackers. In his first asylum application, Sulaj averred that only his brother was detained and beaten. In his second application, however, Sulaj maintained that he too was involved in this incident and that, along with his brother, he had a gun pointed at him and was punched and kicked to such a degree that he required medical attention at a nearby hospital. When questioned about this discrepancy, Sulaj attempted to ascribe fault to the interpreter and then suggested that he may simply have forgotten that he had been beaten and struck with a pistol on that occasion. Moreover, Sulaj provided inconsistent dates for the occurrence of this event. In his first application, he alleged that his brother was attacked in his vehicle in May of 2001, while the second application references October 20, 2001 as the relevant date.

While standing alone, these inconsistencies may be insufficient to cast Sulaj as unworthy of credence, we are of the view that, taken together, they go to the heart of Sulaj's claim. The facts contained in the second application seek to enhance Sulaj's asylum claim by increasing the number and severity of events where he or his family members were mistreated. These inconsistencies are a valid basis for the agency's determination that Sulaj's testimony and declaration lacked credibility. *See Ramaj v. Gonzales*, 466 F.3d 520, 527-28 (6th Cir. 2006) (holding that inconsistencies between two asylum applications support an adverse credibility finding, especially where the second application presented a more compelling case for relief).

**2. Denial of Asylum**

In addition to contesting the adverse credibility determination, Sulaj argues that the IJ and BIA erred in denying his application for asylum. Asylum applications are reviewed under a two-part test. First, the immigration judge must determine whether the petitioner qualifies as a "refugee"

within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A). Second, the immigration judge asks whether the petitioner merits a favorable exercise of discretion by the Attorney General. *Id.* The petitioner bears the burden of proof at both stages. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citing *Klatwitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992)).

The INA defines a "refugee" as any person who is unable or unwilling to return to his home country or last habitual residence "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish his status as a refugee, a petitioner must demonstrate either that he has "suffered actual past persecution or that he has a well-founded fear of future persecution." *Pilica*, 388 F.3d at 950 (citations omitted); *see also Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (per curiam).

Under 8 U.S.C. § 1101(a)(42)(A), past persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998). This Court has clarified that persecution "'does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country.'" *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) (quoting *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993)). Once the petitioner successfully demonstrates past persecution, he is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Mikhailevitch*, 146 F.3d at 389.

If a petitioner is unable to carry his burden of showing past persecution, he may still be eligible for asylum if he can proffer evidence of a well-founded fear of future persecution.

> An alien may establish a well-founded fear of future persecution by demonstrating: (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable probability of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Pilica*, 388 F.3d at 950 (citing *Mikhailevitch*, 146 F.3d at 389, and 8 C.F.R. § 208.13(b)(2)(I)). The government may rebut this presumption by showing, through a preponderance of the evidence, either that (1) there has been a fundamental change in country conditions such that the applicant no longer has a well-founded fear of being persecuted, or (2) the applicant could avoid future persecution by relocating to another part of the applicant's home country. 8 C.F.R. § 208.13(b)(1). A showing of future persecution entails both subjective and objective components: "an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable." *Pilica*, 388 F.3d at 950 (internal quotation marks and citation omitted).

### a. Past Persecution

Applying this standard, substantial evidence supports the IJ's and BIA's determination that Sulaj was unable to demonstrate that (1) his mistreatment rose to the level of persecution and (2) he was targeted on account of his political affiliation with the Democratic Party. First, the IJ concluded that evidence of Sulaj's alleged mistreatment failed to qualify as persecution. We agree. The IJ specifically noted that Sulaj never claimed that he was arrested, detained, interrogated, or imprisoned. At most, Sulaj's testimony about the raid of his store in July of 1999, the extortion

letter, and the attack on him and his brother near their vehicle in 2001 indicates that he suffered a few incidents of physical mistreatment brief in duration and of limited severity. Such events appear to us as "a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 at 390; *see also Lumaj*, 462 F.3d at 577 (holding that an isolated incident where petitioner was attacked at a political rally, beaten, and forced into a car in an unsuccessful attempt to abduct and sexually assault her did not rise to the level of persecution).

Even assuming, however, that this conduct qualifies as persecution, the evidence does not compel the conclusion that these acts were carried out on account of Sulaj's Democratic political beliefs. Based on the country reports submitted by the government, the IJ concluded that Sulaj was most likely the victim of criminal gang activity rather than political persecution. As the IJ observed, Sulaj failed to establish that he held an office in the Democratic Party or that his political activities with the Democratic Party constituted little more than common membership. Sulaj further failed to identify any reason why the Socialist authorities would identify him as a leader or significant supporter of the Democratic Party. While Sulaj testified to his father's active role as a party leader, this does not explain why he, rather than his father, would be targeted by Socialist agents.

### b. Future Persecution

Beyond Sulaj's inability to establish past persecution, he is further unable to proffer evidence of a well-founded fear of future persecution. In denying Sulaj's asylum claim, the IJ found that, due to the ascendancy of the Democratic Party in Albania, country conditions had changed significantly enough since Sulaj departed that he was not entitled to the presumption of future persecution. Based

on our review, the record lends substantial support to this conclusion. The Country Report for Albania indicates that the state was in political turmoil between 1997 and 1998, due to disputed elections won by the Socialist Party. Following continued friction between the Democrats and Socialists, in 2005, Democratic Party leader Sali Berisha was elected as Prime Minister of Albania, and the Democratic Party won a substantial majority of seats in Parliament as well. The Asylum Profile for Albania further states that there have been no major outbreaks of political violence since 1998. Since Sulaj is unable to point to any evidence to the contrary, we agree with the IJ and BIA that Sulaj has failed to demonstrate a well-founded fear of future persecution. Thus, taken together, a review of the record, including the testimonial evidence of Sulaj, his asylum application, and supporting documentation, leads us to conclude that the IJ's and BIA's denial of asylum is buttressed by reasonable, substantial, and probative evidence.

## C. Sulaj's Application for Withholding of Removal

In addition to denying Sulaj asylum, the IJ also denied his claim for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A). To establish entitlement to withholding of removal, a petitioner must satisfy a more stringent standard than that for asylum by demonstrating a clear probability that he will be persecuted on account of one of the protected grounds. *INS v. Stevic*, 467 U.S. 407 (1984). Because Sulaj failed to establish eligibility for asylum, he necessarily fails to satisfy the higher standard for withholding of removal. *Id*.

## D. Sulaj's Application for CAT Relief

Along with his claims for asylum and withholding of removal, the IJ denied Sulaj's request

for relief under the CAT. CAT protection is available to an applicant who can demonstrate that it is more likely than not that he will be tortured "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Ali v. Reno*, 237 F.3d 591. 596 (6th Cir. 2001). We review an immigration judge's and the BIA's findings that an alien is not eligible for relief under the CAT for substantial evidence. *Singh*, 398 F.3d at 400.

In Sulaj's case, there is substantial evidence to support the IJ's and BIA's determination that he failed to demonstrate eligibility for CAT relief. Sulaj adduced no evidence that the government of Albania had tortured him or had acquiesced in his torture by others in the past. Moreover, given the rise of the Democratic Party to power in Albania, it is unlikely that Sulaj would be tortured in the future by a government run by his own political party.

## IV. CONCLUSION

For the preceding reasons, we **DENY** the petition for review.