**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0042n.06
Filed: January 21, 2009

Nos. 06-3491, 07-3130

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LEKE PEPAJ & JUSTINA PEPAJ, | ) ) ) | |
| | ) | **ON PETITION FOR REVIEW** |
| **Petitioners,** | ) | OF AN ORDER OF THE |
| | ) | BOARD OF IMMIGRATION |
| v. | ) | APPEALS |
| | ) | |
| MICHAEL B. MUKASEY, | ) | |
| | ) | **O P I N I O N** |
| **Respondent.** | ) | |
| | ) | |

**Before: MARTIN and MOORE, Circuit Judges; and GWIN,\* District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioners Leke Pepaj ("Leke") and Justina Pepaj ("Justina") (referred to jointly as "the Pepajs") seek review of the Board of Immigration Appeals' ("BIA") order affirming the immigration judge's ("IJ") denial of their applications for asylum and withholding of removal. The Pepajs argue that (1) the IJ was biased, which violated the Pepajs' due-process rights, (2) the BIA deprived the Pepajs of their due-process rights by not adequately explaining its decision and by taking administrative notice of certain facts, (3) the BIA abused its discretion by dismissing the Pepajs' appeal of the IJ's denial of the Pepajs' application for asylum and withholding of removal, and (4) the BIA abused its discretion in denying the Pepajs' motion to reopen. For the reasons explained below, we **DENY** the petition for review.

---

\*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

# I. FACTS AND PROCEDURE[1]

The Pepajs are Albanian citizens. Leke was born on March 8, 1957, in Albania. Leke married his fellow Albanian, Justina, on August 21, 1990, and the couple has one son. Leke arrived in the United States without a valid visa on or about April 3, 2001. Shortly thereafter, on September 13, 2001, Leke filed an administrative application with the former Immigration and Naturalization Service ("INS")[2] for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), which was referred to the IJ. Leke was charged with being subject to removal pursuant to 8 U.S.C. § 1227(a)(1)(A) on April 6, 2002. On April 16, 2002, Leke conceded removability before the IJ.

Justina left Albania on February 5, 2003, and landed at Chicago's O'Hare International Airport on February 6, 2003. Justina had a passport issued in another person's name and was charged with being subject to removal pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), (7)(A)(i)(I), on February 19, 2003. While Justina was at O'Hare, an INS officer interviewed her. During this interview, Justina stated that she was coming to the United States "to be with [her] husband" because she did not "want to be by [her]self." Joint Appendix ("J.A.") at 84 (Justina's Sworn Stmt. at 4). Justina also stated that she was not afraid to return to Albania, but that she did not want to return "[b]ecause life over there is very sad and [she didn't] want to live there anymore." J.A. at 86 (Justina's Sworn Stmt. at 6). Justina submitted an application for asylum, withholding of removal,

---

[1]The facts described in this section are derived from the Pepajs' testimony and other evidence presented by the Pepajs. Inconsistencies found by the IJ are noted where relevant.

[2]The Department of Homeland Security's Bureau of Immigration and Customs Enforcement and Bureau of Citizenship and Immigration Services replaced INS in 2003. *Niyibizi v. Mukasey*, No. 07-3805, 2008 WL 4889008, at *1 n.1 (6th Cir. 2008) (unpublished opinion).

and CAT protection, basing her application on Leke's claims. The application was referred to an IJ, Justina's venue was changed from Chicago to Detroit, and Justina's and Leke's cases were consolidated. Subsequently, Justina appeared before the IJ and conceded removability.

On June 28, 2004, the IJ held the merits hearing. The Pepajs testified and presented several pieces of documentary evidence. According to the evidence, Leke and his family faced problems in Albania for more than 50 years due to their opposition to the Communist government that ruled Albania until 1992. When one of Leke's brothers was 16 years old, he was imprisoned for political reasons for five years, from 1966 to 1971.[3] Further, according to Leke's written statement, when Leke was in eighth grade, he was "singled out as [an] enemy of the communist party" for an essay he wrote in which Leke "explained [his] opinion [on what he] thought was right." J.A. at 107 (Leke Asylum App. at 21). Because of this essay, "[t]he party secretary and the police interrogated and beat" Leke, and Leke was not allowed to continue with his education past the eighth grade. *Id*. When asked about the topic of the essay during his hearing testimony, Leke explained that the essay was about "spring in our life, spring in our hearts" and what Leke thought about those issues. J.A. at 121 (Hr'g Tr. at 50). Leke testified that he "wrote for the dream in [his] heart about this thesis because [he] was suffering, [he] was deprived of [his] rights." *Id*. Leke also acknowledged that this was "the biggest thing that happened to" Leke and that, because of the essay, he was called in front of his entire village and "pointed out as an enemy to the State." *Id*. However, during his testimony, Leke did not mention being beaten as a result of writing the essay until directly asked about this omission on cross-examination. When given the opportunity to explain the omission, Leke stated

---

[3]Though unclear from the record, it appears that this brother is still living in Albania.

3

that "it has been always a hard thing to mention what happened to me." J.A. at 152-53 (Hr'g Tr. at 101-02).

Leke further testified that he became involved in the Democratic Party in 1990. He recounted the various positions he held in the Democratic Party over the years, as well as his many encounters with the police and other persons associated with the Communist and Socialist parties. During many of these encounters, Leke claimed that he was "beaten" and "offended," but he did not detail exactly how he was beaten and offended. J.A. at 127-33 (Hr'g Tr. at 70-76). Leke had previously mentioned these events in his written statement; however, Leke did not testify at the hearing about all of the events detailed in his statement. Leke also did not mention during his testimony or in his written statement any negative actions taken against him from 1992-1997, when the Democratic Party was in power in Albania.

Leke did provide some details regarding a police raid of his house at midnight on October 16, 2000, following an election. He testified that the police searched his home and "violated me, [and] attacked [Justina] as well. They throw away my son and afterwards I was taken into police station." J.A. at 133 (Hr'g Tr. at 76). Leke further explained that the police "push[ed his] son." *Id.* In Leke's written statement, however, Leke stated only that the police "tortured and interrogated" Leke at the police station; he made no mention of the police harming Justina or his son. J.A. at 110 (Leke Asylum App. at 24).

Leke also testified that, due to his political activities, he received repeated verbal threats "about kidnaping [his] wife and [his] son." J.A. at 132, 134-35, (Hr'g Tr. at 75, 77-78). These threats continued until at least February 16, 2001, when Leke "took the steps to protect [him]self and [his] family" by moving the family to Montenegro. J.A. at 137 (Hr'g Tr. at 80). Leke made no

4

mention of written threats. Leke also claimed that his life was threatened on February 4, 2001, when bullets were shot over Leke's head, followed by a phone call stating that the next shots would be fired "on [Leke]." J.A. at 135 (Hr'g Tr. at 78).

According to Leke's testimony, he and the family went back and forth several times between Albania and Montenegro before he left for the United States. Even though Leke was in Montenegro at the time he made preparations to leave for the United States, Leke returned to Albania and left from that country for the United States on April 3, 2001.

Justina also testified at the hearing. Justina explained that she and her son continued to move back and forth between Albania and Montenegro after Leke entered the United States because they "were worried[; they] were bored staying without [Leke] and there's no place, so [they] were just moving around." J.A. at 155 (Hr'g Tr. at 106). However, during Justina's INS interview, she never mentioned that she had been to Montenegro; Justina stated that she had been only to the countries of Albania, Switzerland, and Yugoslavia in her lifetime. When asked about this discrepancy during cross-examination, Justina claimed that she thought that she "had to answer only for the cases [when she] was legally crossing the border." J.A. at 162 (Hr'g Tr. at 121). She also explained that, while she was being interviewed by INS, she "was confused," "worried," and "shocked because [she] left a part of [her] family" in Albania. *Id*.

Justina further testified that, after Leke left, she and her son continued to be harassed and threatened by the police when they were in Albania. However, she stated that she left her son in Albania with an uncle, that she still talks to her son, and that the son has had no problems since she left.

5

Justina also testified about the October 2000 police raid of her house, stating that the police "searched the house, they tortured, beat us, me, my husband, my son." J.A. at 159 (Hr'g Tr. at 110). Justina further claimed that the police "beat [her] with their police trench, and [that she has] some black lines in [her] body because of beatings." *Id*. Also, according to Justina, the police beat her son and made him cry and "told him we're going to kill your father, we're going to kidnap your mother." *Id*.

Justina was cross-examined regarding the fact that she did not claim any ill-treatment or fear of returning to Albania in her INS interview. She explained that, at the time of the INS interview, she was very stressed, exhausted, and could not concentrate. Moreover, she believed she could tell everything to her attorney at a later date. The IJ also asked Justina if, to her knowledge, the Pepajs had received written threats, to which Justina responded, "No." J.A. at 167 (Hr'g Tr. at 126).

The hearing was continued until July 23, 2004, at which point the IJ orally denied the Pepajs' applications. The IJ found both Leke and Justina not to be credible, and noted that even "assuming, arguendo, that you do believe the story, [the Pepajs] have only suffered persecution under the communist regime and, therefore, there has been a complete change in Albania and, therefore, they would no longer be entitled to a rebuttable presumption." J.A. at 37 (IJ Oral Dec. at 9). To support his finding regarding credibility, the IJ pointed out a plethora of inconsistencies and omissions involving the Pepajs' testimony, the Pepajs' previous statements, and the documentary evidence provided by the Pepajs. For purposes of the instant petition, three inconsistencies identified by the IJ are important.

First, the IJ stressed the inconsistencies between Leke's written statement regarding the eighth-grade incident and Leke's testimony on the matter. The IJ noted that, even though Leke

6

acknowledged this event to be "the most major thing that happened to him in his life," Leke never told the court during his testimony what the essay was about, the testimony about the event was "vague, [and] ambiguous," and, during direct examination, Leke never mentioned being beaten because of the essay. J.A. at 46 (IJ Oral Dec. at 18). This, according to the IJ, raised a "red flag about [Leke]'s credibility." *Id.*

Second, the IJ found that a letter written by a Democratic Party leader and submitted as evidence by the Pepajs undermined the Pepajs' credibility. This letter stated that Leke received written threats regarding the kidnaping of the Pepajs' son. However, neither Leke or Justina ever testified that Leke received written threats. The IJ emphasized that when he directly asked Justina "if she was aware of any written threats with respect to the son's threatened kidnaping, . . . she said a resounding no." J.A. at 57 (IJ Oral Dec. at 29).

Third, the IJ found inconsistencies in the varying stories that the Pepajs told about the October 2000 raid of the Pepajs' home. Specifically, the IJ noted that Leke, in his written statement, never mentioned anything about Leke's son being assaulted, but then testified that the police pushed the son. Justina testified that the police beat, tortured, and threatened her son. The IJ noted that Justina appeared to "just want[] to develop the story and cannot quite keep the story straight." J.A. at 76 (IJ Oral Dec. at 48).

Given the negative credibility finding, the IJ concluded that the Pepajs had failed to show that they suffered past persecution or had a well-founded fear of future persecution. The IJ also reviewed country reports submitted by both parties and concluded that, even if the Pepajs had proven past persecution,

> [the Pepajs'] own Country Reports reflect that country conditions have changed
> remarkably and they can no longer demonstrate a well-founded fear of future

persecution and they can no longer demonstrate that it is more likely than not that this would happen to them whether you characterize it as persecution or torture if they were to return to today's Albania.

J.A. at 78-79 (IJ Oral Dec. at 50-51). Based on these findings, the IJ denied the Pepajs' applications.

The Pepajs appealed the IJ's denial of asylum and withholding of removal to the BIA, arguing that the inconsistencies noted by the IJ did not support an adverse credibility finding. On May 20, 2006, the BIA dismissed the appeal, noting that the BIA

> agree[s] with the [Pepajs'] contention that some of the observations by the Immigration Judge, such as minor inconsistencies relating to peripheral facts, will not by themselves support an adverse credibility finding. However, inasmuch as the Immigration Judge cited discrepancies between the [Pepajs'] testimony, asylum application, and evidence submitted, which involved the basis of the [Pepajs'] claims, we find no clear error in his adverse credibility finding.

J.A. at 9 (03/20/06 BIA Ord. at 2) (internal citations omitted). The BIA went on to point out three specific inconsistencies that supported an adverse credibility finding: (1) the inconsistencies regarding the eighth-grade incident; (2) the inconsistencies regarding the form of the threats received; and (3) the inconsistencies regarding the October 2000 raid of the Pepajs' house.

The BIA further noted that "even assuming the [Pepajs] testified credibly and suffered past persecution . . . we find that there has been a fundamental change in country conditions thereby rebutting the presumption that they have a well-founded fear of future persecution." *Id.* To support this holding, the BIA took "administrative notice that the Democratic Party and its allies won the 2005 general elections and that the Democratic Party's leader, Sali Berisha, is now the prime minister of Albania." *Id.* The BIA concluded that, "[i]nasmuch as the government is now controlled by the Democratic Party, rather than the Socialist Party, we find that the [Department of Homeland Security] has rebutted the presumption that the [Pepajs] have a well-founded fear of persecution on

8

account of [Leke's] active participation in the Democratic Party." J.A. at 10 (03/20/06 BIA Ord. at 3). The Pepajs timely petitioned this court for review of this decision.

The Pepajs also filed a motion to reopen with the BIA on July 24, 2006. The BIA found that, even though the motion was

> styled a "motion to reopen," its content dictates that it be treated as a motion to reconsider. However, [sic] styled, the motion is untimely, as its filing exceeds the time limitations set forth in the statute and regulations. *See* sections 240(c)(6)(A) and (7)(C)(i) of the Act, 8 U.S.C. §§ 1229a(c)(6)(A) (a motion to reconsider shall be filed within 30 days of the date of the entry of a final administrative order of removal), 7(C)(i) (a motion to reopen shall be filed within 90 days of the date of entry of a final administrative order).

Supp. J.A. at 7 (01/05/07 BIA Ord.). The BIA further noted that, in the motion, the Pepajs did not address the untimely nature of the motion, nor "the dispositive adverse credibility finding entered against them, and their allegation of procedural error by the [BIA] is without merit." *Id*. The BIA denied the motion, and the Pepajs timely filed a petition for review of this decision. The two petitions for review were consolidated on February 2, 2007, resulting in the instant case.

## II. ANALYSIS

### A. Standard of Review

"When the BIA does not summarily affirm or adopt the IJ's reasoning and provide[s] an explanation for its decision, we review the BIA's decision as the final agency determination." *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008) (internal quotation marks omitted) (alteration in original). "When reviewing a final order of removal, we review factual findings under the substantial evidence standard," which compels us to accept "findings of fact a[s] conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ndrecaj v. Mukasey*, 522 F.3d 667, 672-73 (6th Cir. 2008) (internal quotation marks omitted).

9

Although the Pepajs' brief is difficult to decipher, it appears the Pepajs make four arguments on appeal: (1) the IJ was biased, which violated the Pepajs' due-process rights; (2) the BIA deprived the Pepajs of their due-process rights by not adequately explaining the reasons for its decision and by taking administrative notice of certain facts; (3) the BIA abused its discretion in affirming the IJ's denial of the Pepajs' application for asylum and withholding of removal; and (4) the BIA abused its discretion in denying the Pepajs' motion to reopen. We address each argument in turn.

## B. Due-Process Claims

We apply the following standard in evaluating due-process claims in removal proceedings:

> We review de novo alleged due process violations in removal hearings. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). We have stated that "Fifth Amendment guarantees of due process extend to aliens in [removal] proceedings, entitling them to a full and fair hearing. To constitute fundamental unfairness, however, a defect in the removal proceedings must have been such as might have led to a denial of justice." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (internal quotation and citations omitted). Thus, "proof of prejudice is necessary to establish a due process violation in an immigration hearing." *Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004). Therefore, reviewing an alleged due process violation is a two-step inquiry: first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it.

*Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). The Pepajs make two due-process claims: (1) the IJ was biased, leading to an unfair hearing, and (2) the BIA did not adequately explain its decision and improperly took administrative notice of changed country conditions in Albania.

### 1. IJ Bias[4]

The Pepajs' IJ bias claim is meritless. We have acknowledged that "[a] neutral judge is one of the most basic due process protections." *Id*. (internal quotation marks omitted) (alteration in original). However, in this case, the Pepajs have presented little evidence of bias. In their brief, the Pepajs repeatedly make accusations that the IJ was fundamentally unfair and lacked impartiality, but they present no concrete evidence that this was in fact the case. Rather, the Pepajs merely explain "the inherent difficulties arising from cross-cultural misunderstandings in the asylum context," and point out that the IJ made what the Pepajs believe to be "snide implication[s]" in his oral decision. Pepajs Br. at 29-38. Although the IJ's occasional sarcastic comments were unnecessary and inappropriate, a few such comments are not enough to show that an IJ was biased to the level of a due-process violation. *See Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir. 1996) (noting, in the context of a due-process claim, that petitioners "have no right not to have their feelings hurt by a 'no nonsense' IJ"), *superseded by statute on other grounds as stated in Visha v. INS*, 51 F. App'x 547, 551 (6th Cir. 2002) (unpublished opinion). This is especially true in light of the fact that the IJ's oral decision specifically noted a multitude of inconsistencies that led to his finding that the Pepajs were not credible. *Ndrecaj*, 522 F.3d at 673 (finding no due-process violation where there was "no evidence that [the IJ] did not fairly consider the [petitioners's] evidence" and "[t]he IJ gave a detailed

---

[4]The Government contends that the Pepajs have waived this claim because it was not presented to the BIA. Gov't Br. at 38-39. "Although an alien's due process challenge generally does not require exhaustion (the BIA lacks authority to review constitutional challenges), the alien must raise correctable procedural errors to the BIA." *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). However, in the instant case, it is not entirely clear that the Pepajs did not raise this claim before the BIA; in their brief before the BIA, the Pepajs cited *Ahmed v. Gonzales*, 398 F.3d 722 (6th Cir. 2005), a case addressing procedural due-process issues, and asserted misconduct by the IJ. J.A. at 24 (Pepajs BIA Br. at 4). Because the Pepajs' claim fails on the merits, we decline to decide the waiver issue.

11

description of all of the inconsistencies that he identified and then explained how those inconsistencies supported his finding that [the petitioner] was not credible"). Thus, we hold that the Pepajs' due-process rights were not violated by bias of the IJ.

### 2. BIA Opinion

The Pepajs' claims that the BIA violated their due-process rights by not adequately explaining its decision and improperly taking administrative notice of changed country conditions in Albania are equally meritless. As we have noted, "the Board has no duty to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) (internal quotation marks omitted).

First, it is important to note that, in the Pepajs' brief, the Pepajs grossly mischaraterize the BIA's order denying asylum and withholding of removal. Contrary to the Pepajs' assertions, the BIA order does not disagree with the factual findings of the IJ, but still uphold the IJ's decision. Rather, the BIA noted that some of the inconsistencies that the IJ highlighted were not alone sufficient to support an adverse credibility finding, but that other inconsistencies found by the IJ were sufficient. J.A. at 9 (03/20/06 BIA Ord. at 2). Moreover, the BIA did not assume past persecution and decide the case on changed country conditions. The BIA explicitly stated it found no clear error in the IJ's adverse credibility finding based on three specific inconsistencies that the IJ noted. Based on this fact, the Pepajs failed to show eligibility for relief. The BIA mentioned changed country conditions only as an alternative, albeit unnecessary, reason to deny the application. Such alternative reasoning does not give rise to a due-process violation.

Additionally, a fair review of the BIA order reveals that the BIA "consider[ed] the issues raised, and announce[d] its decision in terms sufficient to enable a reviewing court to perceive that it ha[d] heard and thought and not merely reacted." *Scorteanu*, 339 F.3d at 412. Specifically, the BIA listed the inconsistencies that supported an adverse credibility finding, complete with citations to the record that illustrated those inconsistencies. Thus, it is factually incorrect to say that the BIA did not explain its reasoning.

Furthermore, "[s]everal courts of appeals, including ours, have upheld the practice of an IJ or the BIA taking administrative notice of commonly known facts." *Vasha*, 410 F.3d at 874 n.5. It is a commonly known fact that the Democratic Party regained control of the Albanian government as a result of the 2005 elections. *See Sulaj v. Mukasey*, 287 F. App'x 481, 489 (6th Cir. 2008) (unpublished opinion) (noting that "in 2005, Democratic Party leader Sali Berisha was elected as Prime Minister of Albania, and the Democratic Party won a substantial majority of seats in Parliament"). The Pepajs do not appear to dispute this fact, but rather argue that, in the instant case, it was a violation of due process to take administrative notice of changed country conditions because the Pepajs were not given an opportunity to present contrary evidence. Again, the Pepajs misstate the facts. The IJ in his oral decision listed changed country conditions as an alternative basis for denying relief. Although the 2005 elections had not occurred at the time of the IJ's decision, the Pepajs were on notice that a change in country conditions could be an issue on appeal as a basis to deny relief. Simply because the Pepajs chose not to dispute such an argument before the BIA does not make an otherwise proper action by the BIA a due-process violation.

Morever, even if it was improper for the BIA to take administrative notice of the changed country conditions of Albania, the Pepajs cannot show prejudice, a requirement to prove a due-

13

process violation. *Vasha*, 410 F.3d at 872. The BIA based its denial of the Pepajs' application on the adverse credibility determination, not the changed country conditions. J.A. at 9 (03/20/06 BIA Ord. at 2); *see also* Supp. J.A. at 7 (01/05/07 BIA Ord.) (noting that the adverse credibility determination was dispositive in the March 20, 2006 order). As we explain below, this adverse credibility finding was supported by substantial evidence. Thus, the Pepajs cannot meet the prejudice prong of the due-process standard. Therefore, we hold that the BIA did not violate the Pepajs' due-process rights.

## C. Asylum Claim

The Pepajs argue that the BIA abused its discretion by affirming the IJ's denial of the Pepajs' application for asylum. To be eligible for asylum, the Pepajs must show that they cannot return to Albania "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Even if such a showing is made, the IJ still has discretion to grant or deny asylum. *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). A petitioner can rely solely on his testimony to establish past persecution if the IJ or the BIA finds the testimony credible. *Ndrecaj*, 522 F.3d at 674. "An adverse credibility finding must be based on issues that go to the heart of the applicant's claim" and "must be supported by specific reasons." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). When reviewing credibility determinations, we apply the substantial-evidence standard, which prevents us from overturning an adverse credibility determination "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ndrecaj*, 522 F.3d at 672-73 (internal quotation marks omitted).

After reviewing the record, we cannot say that we are compelled to conclude that the IJ and the BIA erred in their findings that the Pepajs were not credible. Though we agree with the BIA that some of the inconsistencies the IJ pointed out do not go to the heart of the matter and cannot support an adverse credibility finding, the three inconsistencies specifically noted and relied on by the BIA do go to the heart of the matter—the eighth-grade incident, the form of the threats, and the raid of the Pepajs' home. Because the BIA and the IJ relied on these inconsistencies, we conclude that "[t]here is not sufficient evidence to compel a finding of credibility." *Sall v. Gonzales*, 251 F. App'x 337, 341 (6th Cir. 2007).

Because the adverse credibility determination in this case is dispositive, we decline to address the Pepajs' argument that the BIA abused its discretion in concluding that, even if the Pepajs showed past persecution, changed country conditions in Albania rebut the presumption of a well-founded fear of future persecution.

**D. Withholding of Removal**

Although not entirely clear, it appears that the Pepajs also petition us to review the BIA's denial of their application for withholding of removal. "To prevail on a petition for withholding of removal under the INA, an alien must show that there is a clear probability, that is, that it is more likely than not, that she would be subject to persecution on the basis of [race, religion, nationality, membership in a particular social group, or political opinion] were she removed from this country." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (internal quotation marks omitted). This standard is more stringent than the standard applied to asylum eligibility, *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004); therefore, because the Pepajs are ineligible for asylum, it "follows that [the

15

Pepajs] cannot satisfy the more stringent standard for withholding of [removal]." *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001).

## E. Motion to Reopen

The Pepajs argue that the BIA abused its discretion in denying their motion to reopen. However, even assuming that the BIA did abuse its discretion in this regard, the Pepajs' motion did not address the BIA's dispositive adverse credibility finding; the motion merely contested the BIA's conclusion regarding the changed country conditions in Albania. Supp. J.A. at 12-15 (Pepajs Motion to Reopen at 1-4). Thus, the motion to reopen does not affect the overall outcome of the instant appeal. Therefore, we decline to consider the matter further.

## III. CONCLUSION

Because (1) the IJ and the BIA did not violate the Pepajs' due-process rights, (2) the BIA did not abuse its discretion in affirming the IJ's denial of the Pepajs' asylum and withholding of removal claim, and (3) we need not consider the BIA's denial of the Pepajs' motion to reopen, we **DENY** the Pepajs' petition for review of the BIA order.