*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0158p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

URIM NDRECAJ, ARDIANA NDRECAJ, UENDI NDRECAJ, UEDA NDRECAJ,

*Petitioners,*

*v.*

MICHAEL MUKASEY, Attorney General of the United States,

*Respondent.*

No. 07-3385

---

On Petition for Review of an Order
from the Board of Immigration Appeals.
Nos. A95 476 633; A95 476 634;
A95 476 635; A95 476 636.

Submitted: February 20, 2008

Decided and Filed: April 16, 2008

Before: MOORE and McKEAGUE, Circuit Judges; SCHWARZER, District Judge.[*]

---

### COUNSEL

---

**ON BRIEF:** Roger R. Rathi, LEGALQUEST NETWORK, Southfield, Michigan, for Petitioners. Rebecca A. Niburg, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. The lead petitioner, Urim Ndrecaj ("Ndrecaj"), and his family seek review of the BIA's order removing them to Albania. The Immigration Judge ("IJ") concluded that Ndrecaj was not credible and thus found him and his family ineligible for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"). The Board of Immigration Appeals ("BIA") adopted the IJ's decision without opinion. We conclude that the evidence does not compel a contrary conclusion as to Ndrecaj's credibility, and we **DENY** the petition for review of the BIA's decision.

---

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

# I. BACKGROUND

Ndrecaj was born in Albania. J.A. at 131 (Oct. 19, 2005, Hr'g Tr. at 29:13-16). His family had a history of opposing the then-ruling Communist Party. In 1961, his father was arrested for advocating against the Communists. J.A. at 132 (Hr'g Tr. at 30:7-17). Because of his father's political activities, Ndrecaj said that while growing up he "was persecuted by friends, guy friends and girl friends, from my own teachers, [and] from a youth organization that were formed at the time by the Communist government." J.A. at 132 (Hr'g Tr. at 30:20-25). He was even "named as a child of a prisoner against the government." J.A. at 133 (Hr'g Tr. at 31:12-13).

The Communist Party evolved into the Socialist Party, J.A. at 218 (U.S. Dep't of State, 2004 Country Report on Human Rights Practices: Albania at 9), whose main opposition has been the Democratic Party. According to Ndrecaj, he first joined the Democratic Party in 1992 but had participated in political events prior to that date. J.A. at 140-41 (Hr'g Tr. at 38:24-39:1). Ndrecaj married Ardiana in August 1997. J.A. at 131 (Hr'g Tr. at 29:24-25).

In his Application for Asylum and Withholding of Removal ("I-589"), his statement that he filed several months later to correct his I-589, and his testimony before the IJ, Ndrecaj mentioned several events that occurred in Albania. The first of these events followed a protest in September 1998. Ndrecaj told the IJ: "I participated in a protest that occurred during, September 12[, 1998] was when Azim Hajdari was assassinated." J.A. at 143 (Hr'g Tr. at 41:8-11). A few weeks after the protest, on September 21, Ndrecaj was arrested at his home for having participated in the protest. J.A. at 143 (Hr'g Tr. at 41:20-24). The officers held Ndrecaj for three days during which time he was punched, kicked, beaten with rubber sticks, and starved. J.A. at 144-45 (Hr'g Tr. at 42:20-43:3). As he was leaving the jail, they told him, "the worst is yet to come to you, your family, and to your friends." J.A. at 152 (Hr'g Tr. at 50:8-9). Upon returning home, he sought medical attention for the bruises he had sustained. J.A. at 152 (Hr'g Tr. at 50:13-17).

The original statement that Ndrecaj attached to his I-589 mentioned an arrest on September 21, 1998, following the protests after Hajdari's assassination. The I-589 was mostly consistent with his other statements in that he wrote: "They held me in their cells for three nights by torturing me both physically and psychologically." J.A. at 300 (I-589 Stmt.). There were, however, a couple of inconsistencies. First, his I-589 said that he was arrested "in the center of the village Vrake," yet his supplemental statement to correct the I-589 noted that it was a mistake and that he was actually arrested at his home in Vrake. J.A. at 308 (Supp. Stmt. at 6). Second, in contrast to his other statements, his original I-589 did not say explicitly that he had attended the September 1998 protest himself.

The second of the incidents Ndrecaj discussed occurred in February 1999. On February 22, Ndrecaj was arrested at his home for having participated in another protest. This time the officers held him for two days and mistreated him, but "it was not as severe as the first time." J.A. at 153-54 (Hr'g Tr. at 51:3-52:1). According to Ndrecaj, "[t]hey were trying to destroy me in both ways, physically and spiritually, with my ideas that I had in me, which they were the democratic idea . . . ." J.A. at 154 (Hr'g Tr. at 52:23-25). Ndrecaj was consistent with regard to this story, mentioning it in his initial I-589 statement, J.A. at 300 (I-589 Stmt.), and his supplemental statement, J.A. at 309 (Supp. Stmt. at 7), as well as in his testimony.

The third group of incidents that Ndrecaj discussed were the few occasions when officers questioned him about his political activities. In July 1999, Ndrecaj had an encounter with the area inspector. J.A. at 155 (Hr'g Tr. at 53:5-8). Then again, in January 2000, officers called him to ask him additional questions. J.A. at 157 (Hr'g Tr. at 55:1-4). Ndrecaj was consistent as to these occurrences, mentioning them in his I-589 statement, J.A. at 301 (I-589 Stmt.), and his supplemental statement, J.A. at 309 (Supp. Stmt. at 7), as well as in his testimony.

The fourth incident Ndrecaj discussed was a home visit from officers during October 2000. On October 10, 2000, officers broke into Ndrecaj's house. "They came to my house by force. They took me, and took me to the kitchen. I told my wife to leave, to go in the other room, because our children were young." J.A. at 158 (Hr'g Tr. at 56:8-10). According to Ndrecaj's testimony, the officers wanted to know whether he would tell any international agencies about voter fraud. J.A. at 159-60 (Hr'g Tr. at 57:21-58:7). When asked by the IJ whether he had observed any voter fraud, Ndrecaj testifed that he noticed Socialist Party members giving extra ballots to their supporters. J.A. at 160 (Hr'g Tr. at 58:17-24). Following this event, he and his family moved to a new neighborhood. J.A. at 161-62 (Hr'g Tr. at 59:18-60:6).

Ndrecaj was not completely consistent with regard to the October 2000 event. Although all of his statements mention the officers' visit, in his initial I-589 statement Ndrecaj did not mention voter fraud, instead giving a more vague statement: "One of them began asking me questions about my activities with DP." J.A. at 301 (I-589 Stmt.). Like his testimony, Ndrecaj's supplemental statement was more detailed, stating "I believe that this attack committed by the police intended to intimidate me and prevent me from denouncing the vote fraud committed by the SP in the country." J.A. at 310 (Supp. Stmt. at 8.).

The fifth and final issue was an arrest in June 2001. This time, Ndrecaj was arrested and held for one day, during which time officers beat him and told him that he could not tell anyone that he had observed voter fraud. J.A. at 163-64 (Hr'g Tr. at 61:19-62:2). In his I-589, Ndrecaj mentioned protests on this date but did not mention being arrested. J.A. at 302. (I-589 Stmt.). He did, however, mention the arrest in his supplemental statement. J.A. at 311-12 (Supp. Stmt. at 9-10).

Ndrecaj testified that he and his family left Albania and traveled to the United States via Italy, France, and England, spending a night in each location. J.A. at 165 (Hr'g Tr. at 63:6-24). He claimed that they could not stop along the way because they were traveling under the control of the individuals who had arranged their travel. J.A. at 177 (Hr'g Tr. at 75:5-9).

On May 6, 2002, Ndrecaj signed his I-589. In that form he stated that "I know I will be arrested and tortured if I return to Albania, because of my political behavior." J.A. at 282 (I-589 at 6). Ndrecaj submitted a statement along with his I-589, but subsequently filed a statement supplementing the original because he later learned that the original statement "was unprofessionally done, and it was in a matter of way of sloppy job." J.A. at 181-82 (Hr'g Tr. at 79:24-80:1).

During Ndrecaj's testimony before the IJ, Ndrecaj mentioned how, despite the fact that the Socialist Party was no longer in control of Albania, he still feared returning. He stated that he feared the Socialists would return to power: "they would try and take over the government just like that happened in 1997 by force, which they took the government by force." J.A. at 166 (Hr'g Tr. at 64:19-21). In addition, even if the Socialists did not return to power, Ndrecaj believed that some of "the same people are in power" at police stations. J.A. at 185 (Hr'g Tr. at 83:19-23). Despite these concerns, he admitted that he was aware of no recent problems for any Democrats in Albania. J.A. at 167 (Hr'g Tr. at 65:11-13). He also admitted that his parents, still in Albania, had not suffered any physical harm, "due to their age." J.A. at 174 (Hr'g Tr. at 72:21-22).

Ndrecaj's wife also testified before the IJ. Initially, when asked if she was ever a member of a political party, she said no. At that point, Ndrecaj said something in Albanian, and she then altered her story and said she had joined the Democratic Party in 2000. J.A. at 191-92 (Hr'g Tr. at 89:24-90:21).

On October 19, 2005, the IJ entered an oral decision. The primary basis of the IJ's decision was his conclusion that "the respondent has not demonstrated to be a credible person." J.A. at 66 (IJ Dec. at 8). In addition, "the Court notes that country conditions have changed since the

respondent left Albania. In fact, it is recognized [th]at the Democratic Party of Albania won an election in Albania earlier this year." J.A. at 67 (IJ Dec. at 9). Lastly, the IJ noted that even if he had believed Ndrecaj's claims of past persecution, "the Court would not grant him any discretionary asylum relief, because on his way to the United States, the respondent" stopped in at least four countries and "he should have applied for asylum in those countries." J.A. at 68 (IJ Dec. at 10).

The IJ found Ndrecaj to be not credible because of several alleged inconsistencies in his and his wife's various statements. The IJ suggested that the combination of several inconsistencies made them impossible to ignore, stating in response to one inconsistency that "if this were the only difficulty with the respondent's testimony, the Court could, of course, overlook it, but it is not." J.A. at 76 (IJ Dec. at 18).

The inconsistencies that the IJ noted are as follows:

- When asked if she was ever a member of a political party, Ndrecaj's wife said she was not but changed her story after Ndrecaj said something to her in Albanian. J.A. at 66-67 (IJ Dec. at 8-9); J.A. at 75 (IJ Dec. at 17).

- Ndrecaj wrote in his supplemental I-589 statement that he started working on campaigns in 1996, but he testified that he started working on campaigns in 1997. J.A. at 75-76 (IJ Dec. at 17-18).

- In his original I-589 statement, "his trip to the funeral of Azim Hajdari was not mentioned." J.A. at 78 (IJ Dec. at 20).

- Ndrecaj included a written statement from five individuals who claimed to be neighbors or friends of his, including Anton Bushati and Artin Kola, but at the hearing "[r]espondent said he didn't know either one of those two people. This document is apparently fake, phony, and fraudulent therefore . . . ." J.A. at 79 (IJ Dec. at 21).

- The location of the arrest in September 1998 changed between his I-589 and his supplemental statement. J.A. at 80 (IJ Dec. at 22).

- Ndrecaj did not mention in his initial statement or in his testimony the occasions in July 1999 and January 2000 that he was questioned. J.A. at 81-82 (IJ Dec. at 23-24).

- Ndrecaj's description in his supplemental statement of the comments and intent of the officers during the October 10, 2000, confrontation "basically tells a slightly different story" than his testimony. J.A. at 82-83 (IJ Dec. 24-25).

- Ndrecaj failed to mention the June 2001 arrest in his original I-589. J.A. at 83-84 (IJ Dec. at 25-26).

The IJ also noted several problems with Ndrecaj's documentary evidence. For intance, the IJ was concerned that the Democratic Party membership cards were dated from 2000, J.A. at 84 (IJ Dec. at 26), the report of his September 1998 arrest was not authenticated, *id.*, and the head of the local Democratic Party seemed to lack first-hand knowledge with respect to Ndrecaj, foreclosing reliance on the letter, J.A. at 85 (IJ Dec. at 27). The IJ also seemed concerned about the date that Ndrecaj and his family left Albania, concluding that the amount of time they spent in various locations did not properly add up. J.A. at 92-93 (IJ Dec. at 34-35).

The IJ concluded by saying that Ndrecaj "has not demonstrated what he [said] happened to him, happened to him in Albania.  But even if he did, the country conditions have changed remarkabl[y].  The respondent indicated in his testimony, he'd go back to today's Albania.  So, there's no reason in the Court's view to find that he has a well-founded fear of future persecution."  J.A. at 94 (IJ Dec. at 36).  The IJ then denied Ndrecaj's application for asylum and for withholding of removal under the CAT and the INA, and the IJ ordered the family removed to Albania.  J.A. at 94-95 (IJ Dec. at 36-37).

On November 7, 2005, the Ndrecaj family appealed the IJ's decision.  J.A. at 50-51 (Not. of Appeal).  On March 7, 2007, the BIA affirmed the IJ's decision without opinion.  J.A. at 2 (BIA Order).

## II.  ANALYSIS

### A.  Standard of Review

When the BIA affirms the IJ without issuing its own opinion, we review the IJ's opinion. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003).  When reviewing a final order of removal, we review "factual findings under the substantial evidence standard."  *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005).  Under that standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'"  *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (requiring that the evidence "compel" an alternate conclusion before reversing the BIA); *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) ("[T]he petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution.").

### B.  Due-Process Claims

We succinctly summarized the analytical process for reviewing claims of due-process violations in immigration removal proceedings in *Vasha v. Gonzales*, 410 F.3d 863 (6th Cir. 2005):

> We review de novo alleged due process violations in removal hearings. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).  We have stated that "Fifth Amendment guarantees of due process extend to aliens in [removal] proceedings, entitling them to a full and fair hearing.  To constitute fundamental unfairness, however, a defect in the removal proceedings must have been such as might have led to a denial of justice."  *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (internal quotation and citations omitted).  Thus, "proof of prejudice is necessary to establish a due process violation in an immigration hearing." *Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004).  Therefore, reviewing an alleged due process violation is a two-step inquiry:  first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it.

> Though "[t]he IJ is afforded broad discretion to control the manner of interrogation in order to ascertain the truth," *Mikhailevitch*, 146 F.3d at 391 (internal quotation omitted), we have recognized that "[a] neutral judge is one of the most basic due process protections."  *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003) (internal quotation omitted); *see also Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005) ("It is undisputed that petitioners in such proceedings are entitled to an unbiased arbiter who has not prejudged their claims.").

*Vasha v. Gonzales*, 410 F.3d at 872-73; *accord Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007).

On appeal, Ndrecaj claims that the "IJ did not conduct [the] hearing in a fundamentally fair manner, denying respondents due process." Pet'r Br. at 5. Ndrecaj's main supporting case states that "a hearing where an immigration judge cannot be said to have fairly considered the evidence presented by the petitioners is one where those petitioners have been deprived of due process." *Ahmed*, 398 F.3d at 725-26. In *Ahmed*, the judge blatantly misunderstood the immigrants' evidence and thus deprived them of the opportunity for a fair hearing.

In the case at hand, there is no evidence that the IJ acted more as an advocate than a neutral arbiter, and there is no evidence that he did not fairly consider the Ndrecajs' evidence. The IJ gave a detailed description of all of the inconsistencies that he identified and then explained how those inconsistencies supported his finding that Ndrecaj was not credible. Although Ndrecaj quite understandably disagrees with the IJ's result, he has not presented any evidence that the IJ was biased against him in a way that threatened the fundamental fairness of the hearing. Therefore we conclude that Ndrecaj's due-process challenge is without merit.

## C. Credibility Determination

In order to qualify for asylum, an applicant must pass a "two-step inquiry: first, whether the petitioner is a 'refugee' . . . and second, whether the petitioner merits a favorable exercise of discretion by the IJ." *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007) (citation and footnote omitted). "The burden of proof is on the applicant to establish that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is one "who is unable or unwilling to return to" his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In order to establish refugee status, the applicant must demonstrate either past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). While establishing past persecution requires that an applicant show "'more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty,'" *Ouda*, 324 F.3d at 452 (quoting *Mikhailevitch*, 146 F.3d at 390), in order to show a well-founded fear of persecution, the applicant does not need to establish that his government is more likely than not to persecute him. *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) ("A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" (alteration in original) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987))); *see also Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005).

In order to establish past persecution or a well-founded fear of persecution, the testimony of the applicant may be sufficient, but only if the trier of fact finds the testimony credible. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Perkovic*, 33 F.3d at 621 (noting that testimony is sufficient if the testimony is "believable, consistent, and sufficiently detailed").

The trier of fact can base a credibility determination on "all relevant factors" including the applicant's demeanor and the consistency and plausibility of the various statements. *See* 8 U.S.C. § 1158(b)(1)(B)(iii); 8 U.S.C. § 1229a(c)(4)(C) (applying the same credibility test to statements made in a removal proceeding). "Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. This is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Mapouya*, 487 F.3d at 406; *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006). "While an adverse credibility finding is afforded substantial deference, the finding must be supported by

specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency." *Sylla*, 388 F.3d at 926; *see also Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005).

Accordingly, we review the IJ's determination of a lack of credibility under the substantial-evidence standard. While it is true that "irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination," *Sylla*, 388 F.3d at 926, discrepancies may be relevant if they can "be viewed as attempts by the applicant to enhance his claims of persecution." *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)). Although we believe that the IJ identified a number of irrelevant inconsistencies that did not go to the heart of Ndrecaj's claims, the IJ also identified three more significant discrepancies. Because of these more significant discrepancies, we cannot say that the evidence compels a conclusion at odds with the IJ's decision that Ndrecaj was not credible.

Most of the inconsistencies that the IJ mentioned were irrelevant or not even inconsistencies at all. For instance, whether Ndrecaj started working on political campaigns in 1996 or 1997 does not go to the heart of his claims because he did not claim any arrests or problems with the authorities during either of those years. Similarly, whether he attended the funeral of Azim Hajdari does not go to the heart of his claims because he was consistent in all of his statements in asserting that he was arrested a few days after the funeral. That the location of his 1998 arrest changed between statements does not go to the heart of his claim because at all times he was consistent that he was arrested somewhere in Vrake and neither location improves upon his claims of persecution. And lastly, the IJ was incorrect in stating that Ndrecaj failed to mention the occasions that local officers questioned him, because Ndrecaj was consistent in mentioning these events in all of his statements. None of these supposed inconsistencies undermine Ndrecaj's credibility.

We cannot reverse the IJ's credibility determination, however, unless the evidence compels a different conclusion. The evidence in this case does not compel a different conclusion because the IJ correctly identified three important credibility issues regarding Ndrecaj. The first issue is that Ndrecaj did not mention in his original I-589 application that he was arrested in June 2001. Because the 2001 arrest was the most recent one and supposedly provoked his flight from Albania, the IJ was correct to note that it was odd that Ndrecaj would mention civil unrest during that time period but not mention his own arrest.

Second, the IJ noted that Ndrecaj could not identify two individuals who had signed a letter vouching for him. If these individuals were actually his friends or neighbors, it is reasonable to expect that Ndrecaj would be able to identify them correctly. Because Ndrecaj could not correctly identify the names of his supposed friends and neighbors, this was a valid factor for the IJ to weigh in assessing Ndrecaj's credibility.

Lastly, it was certainly suspicious that Ndrecaj's wife Ardiana said she was not a member of a political party until her husband said something from the audience, at which point Ardiana changed her story. Although there are lots of reasons—such as anxiety, confusion as to the question, or forgetfulness—why Ardiana may have misidentified her affiliation with the Democratic Party, we cannot say that the evidence compels a different conclusion.

In response, Ndrecaj points the court to *Mece v. Gonzales*, 415 F.3d 562 (6th Cir. 2005), a case where we held that the IJ had erred in concluding that the petitioner was not credible. Although we noted in that case that "the failure to mention one beating among many is of little consequence," *id.* at 573, that case involved only one inconsistency that went to the heart of the petitioner's claims, and the rest of the petitioner's claims were well supported by the evidence. In contrast, in the case at hand, the IJ noted three fairly serious inconsistencies, which prevent our concluding that the evidence compels an outcome at odds with the IJ's finding that Ndrecaj was not credible. *See Saliko*

*v. Gonzales*, 207 F. App'x 570, 575 (6th Cir. 2006) (unpublished) (dismissing a petition where the testimony had discrepancies "too pervasive to ignore").

## D. Country Conditions

The IJ's finding that Ndrecaj was not credible prevented the IJ from finding that Ndrecaj established either past persecution or a well-founded fear of future persecution. The IJ, however, offered an alternative basis for denying asylum: the changed country conditions of Albania provided an independent basis for concluding that Ndrecaj could not establish a well-founded fear of future persecution. As the IJ stated:

> In conclusion, the Court notes that first, the respondent has not demonstrated any affiliation with the Democratic Party of Albania; he has not demonstrated what he [said] happened to him, happened to him in Albania. But even if he did, the country conditions have changed remarkabl[y]. The respondent indicated in his testimony, he'd go back to today's Albania. So, there's no reason in the Court's view to find that he has a well-founded fear of future persecution, objectively and subjectively. He certainly hasn't demonstrated it's more likely than not, he would be persecuted, or he would be tortured in today's Albania.

J.A. at 94 (IJ Dec. at 36).

We hold that Ndrecaj's admission that he does not fear Albania in its current state and that he fears only the possibility of the Socialist Party returning to power at some unspecified time in the future is dispositive in establishing that he lacks a well-founded fear of future persecution. Ndrecaj feared that the Socialists "would try and take over the government just like that happened in 1997 by force." J.A. at 166 (Hr'g Tr. at 64:19-21). Ndrecaj even stated that he "can return while the Democratic Party is in power." J.A. at 179 (Hr'g Tr. at 77:24). We have "held that an applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Mapouya*, 487 F.3d at 412 (internal quotation marks omitted). Whether an applicant has a well-founded fear requires individualized consideration, and given that Ndrecaj himself stated that he could return to Albania as long as the Democratic Party is in power, we cannot say that the evidence compels the conclusion that Ndrecaj established a well-founded fear of future persecution.

Aside from Ndrecaj's own statements, the IJ had other evidence upon which he could have relied in concluding that country conditions had changed in Albania. The 2004 State Department Country Report noted that there were some police beatings in Albania, but did not indicate that this was a pervasive or political problem. J.A. at 211-12 (2004 Country Report at 2-3). Furthermore, the report stated that "overall the elections met basic democratic standards and the police, leadership of the electoral campaigns, some local election officials, and electoral institutions performed their duties well." J.A. at 218 (2004 Country Report at 9). In addition, the IJ in his October 2005 decision noted that "the Democratic Party of Albania won an election in Albania earlier this year." J.A. at 67 (IJ Dec. at 9); *accord World Briefing Europe: Albania: Preimier Bows to Defeat*, N.Y. TIMES, Sept. 2, 2005, at A4, *available at* 2005 WLNR 13805006. Thus, on the basis of published reports of Albania's political development, we have previously stated that the conditions in Albania are "fundamentally changed," *Liti*, 411 F.3d at 640, and we cannot fault the IJ for reaching the same conclusion. Given Ndrecaj's admission that he can return to Albania and his failure to show any real threat of individualized persecution, we must agree with the IJ that the changed country conditions provide an independent basis for the IJ's finding of a failure to show a well-founded fear of future persecution.

**E.  Withholding of Removal**

In addition to his asylum claim, Ndrecaj also requested withholding of removal under the INA and the CAT.  When we review a denial of withholding of removal under the INA, "[t]he standard of review requires us to uphold the BIA's determination against withholding the removal of an alien, unless it is 'manifestly contrary to the law.'  Furthermore, any administrative findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003) (quoting *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001)).  The same standard applies to claims for withholding of removal under the CAT. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) ("We review the BIA's decision on a request for withholding of removal under the same standard regardless of whether the request was made pursuant to the INA or the CAT."); *Castellano-Chacon*, 341 F.3d at 552.

In order to qualify for withholding of removal under the INA, the applicant must "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b).  The applicant can establish eligibility for withholding of removal by showing either past persecution, § 208.16(b)(1)(i), or that "it is more likely than not that he or she would be persecuted" on one of these grounds upon removal to the proposed country. § 208.16(b)(2). Similarly, to demonstrate eligibility for withholding under the CAT, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 208.16(c)(2).

The government asks us to hold that Ndrecaj waived his withholding argument because he failed to raise it before the BIA.  We note, however, that Ndrecaj did make mention of the CAT in his brief before the BIA.  J.A. at 21 (Resp't Br. on App. of IJ at 11).  However, we need not address the issue of waiver, because once we conclude that Ndrecaj was ineligible for asylum because of his failure to show a well-founded fear of persecution, he is then automatically incapable of qualifying for withholding of removal.  *Selami*, 423 F.3d at 627 n.2 ("Because Selami failed to establish his eligibility for asylum, 'it therefore follows that he cannot satisfy the more stringent standard for withholding of [removal]' as well." (alteration in original) (quoting *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001))); *Liti*, 411 F.3d at 640-41.  Ndrecaj was therefore ineligible for withholding of removal under the INA or the CAT.

### III.  CONCLUSION

For the foregoing reasons, we **DENY** the Ndrecajs' petition for review of the BIA's removal order.