**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0411n.06

No. 08-4346

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jun 08, 2009**
LEONARD GREEN, Clerk

ABDOULAYE SAMBA BARY,

     Petitioner,

     v.

ERIC H. HOLDER, JR., United
States Attorney General,

     Respondent.

**ON PETITION** FOR
REVIEW OF AN ORDER
OF THE BOARD OF
IMMIGRATION APPEALS

_____

**Before:**     **MARTIN and KETHLEDGE, Circuit Judges; and WATSON, District Judge.**[*]

**WATSON, District Judge.**   Abdoulaye Samba Bary, a native and citizen of

Mauritania, seeks review of the Board of Immigration Appeals' ("BIA") decision which

dismissed his appeal of the Immigration Judge's ("IJ") denial of his applications for asylum,

withholding of removal, and protection under the Convention Against Torture ("CAT").

The BIA affirmed the IJ's determination that Bary had established past persecution, but also

agreed with the IJ's finding of changed country conditions in Mauritania. Bary argues that

the IJ incorrectly determined that Bary failed to prove that he timely filed his application for

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio,
sitting by designation.

asylum, and that the IJ's finding of fundamentally changed country conditions is not supported by substantial evidence. We are without jurisdiction to address Bary's first argument, and find his second argument to be without merit. We therefore **DENY** Bary's petition for review.

## I. BACKGROUND

Bary is black and a member of the Fulani tribe. (JA 116). He was born in Tethiane, Mauritania on July 24, 1968. (JA 146, 165, 166). When Bary lived in Mauritania, he took care of cattle for a living. (JA 146). He married on March 28, 1988. Bary has two children, both of whom were born in Nguidjilone, Senegal. (JA 152).

In the late afternoon of April 29, 1989, Bary was outside the village with his father, taking care of their cows. (JA 147). Members of the Mauritanian military showed up and began to beat Bary's father. (JA 147). Bary attempted to intervene and one of the soldiers beat him with the butt of a gun. Bary passed out. (JA 147). Bary testified that the soldiers had acted out of a belief that his father was part of FLAM, a group that fought for black people's rights. The soldiers took Bary to a jail and put him in a cell with about twenty-five other people. (JA 147). While he was in the jail, Bary learned that his father had died. (JA 148). Bary was mistreated in jail. (JA 147).

Eventually military police officers took Bary and the other detainees to a nearby river on the Mauritania-Senegal border, where the officers threw them into the water and told them

to go to Senegal. (JA 149). Some of the people drowned, but Bary and others managed to swim across the river to Senegal. (JA 149). After he reached Senegal, Bary went to city of Nguidjilone, where he found his mother and wife in a refugee camp. (JA 150). Bary supported his family by gathering roots in the forest and selling them. (JA 152). Later he loaded and unloaded trucks. (JA 155). Bary lived at the refugee camp until July 28, 1995, when he went to Dakar to find work. (JA 152). He was unable to find employment because he was not from Senegal. (JA 152). Bary's wife and children still live in Nguidjilone. (JA 153).

Bary stated that he decided to come to the United States because here he would be treated like everyone else. (JA 153). He testified that he arrived in the United States in New York City, New York on March 18, 2001. (JA 153). He filed his application for asylum on August 27, 2001. (JA 154). Bary said Mauritania has not changed, and he will not return there because he would be killed. (JA 154-55).

On September 11, 2001, Bary filed his applications for asylum and withholding of removal, as well as relief under CAT. (JA 124). He asserted that he was persecuted in Mauritania because he was black and a Fulani, or because he was believed to be a member of FLAM. On July 12, 2005, the Immigration and Naturalization Service served Bary a Notice to Appear which alleged that Bary was deportable. (JA 27). On May 22, 2006, Bary filed a motion to change venue from Cleveland, Ohio to Cincinnati, Ohio. (JA 259). He also

conceded removability. (JA 260). The IJ conducted a hearing on Bary's applications and issued an oral decision denying them on July 25, 2007.

Bary was the only witness at the hearing. The IJ found Bary to be generally credible. (JA 123). Nevertheless, because there was no corroborating evidence, the IJ concluded that Bary failed to meet his burden of showing by clear and convincing evidence that he filed his claim within one year after he entered the United States. (JA 124-25).

The IJ found that Bary had met his burden of establishing past persecution, which gives rise to a presumption of a well-founded fear of future persecution. (JA 125). The IJ held, however, that evidence of changed country conditions in Mauritania rebutted the presumption. (JA 126-27). He based this conclusion on the State Department's Profile for Mauritania. (JA 126). The IJ observed that former President Taya was deposed in a bloodless coup in 2005, and that the government under which Bary had lived was gone. (JA 126). He noted that there had been free and fair elections in Mauritania recently. (JA 126). The IJ further noted that many of the refugees from the 1989 to 1991 period had returned from Senegal to Mauritania, and that many of them had been able to reacquire their property. (JA 126). He acknowledged that significant human rights problems still existed in Mauritania, including discrimination against ethnic and racial minorities. (JA 126). The IJ stated that Bary "may still face unfortunate discrimination and harassment given his race and ethnicity, but this would not put him at risk for actual persecution." (JA 126). In addition,

the IJ noted that Bary had lived in Senegal, away from any eminent threat of persecution, for twelve years before he entered the United States illegally. (JA 127-28). On these bases, the IJ denied Bary's applications for asylum, withholding of removal, and relief under CAT.

Bary appealed the IJ's decision to the BIA. The BIA issued an order affirming the IJ's decision and dismissing Bary's appeal on September 17, 2008. (JA 2). Bary timely filed his petition for review of the BIA's order on October 16, 2008.

## II. ANALYSIS

Bary raises two issues. First, Bary challenges the IJ's finding that he failed to demonstrate by clear and convincing evidence that he filed his application for asylum within one year after entering the United States. Second, Bary asserts that the IJ's finding of changed country conditions is not supported by substantial evidence.

### A. Standard of Review

When the BIA summarily affirms the IJ's decision without discussing the relevant issues in-depth, this Court reviews the IJ's ruling as the final agency decision. *Sarr v. Gonzales*, 485 F.3d 354, 359 (6th Cir. 2007). Factual findings, including findings of changed country conditions, are reviewed under the substantial evidence standard. *Lin v. Holder*, ----F.3d----, 2009 WL 1323443, at *3 (6th Cir. May 14, 2009); *Ndrecaj v. Mukasey*, 522 F.3d 667, 672 (6th Cir. 2008). Under that standard, the agency's findings of fact must be accepted unless any reasonable adjudicator would be compelled to conclude otherwise. *Id.* at 672-73.

**B. Timeliness of Asylum Application**

An alien seeking asylum bears the burden of proving by clear and convincing evidence that the application has been filed within one year after the date of the alien's arrival in the United States. 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 1208.4(a)(2). Bary argues that the IJ erred when he found that Bary had failed to show by clear and convincing evidence that he timely filed his application for asylum within one year after entering the United States. Bary maintains that he satisfied his burden through his direct testimony that he arrived in the United States on March 18, 2001. Bary points out that the IJ found that his testimony was credible. It is undisputed that Bary filed his application for asylum on August 27, 2001.

Although the Government in the instant case did not address jurisdiction with respect to the IJ's finding that Bary failed to establish timeliness, "'we are under an independent obligation to police our own jurisdiction,' and thus we can raise the issue of jurisdiction sua sponte." *Bonner v. Perry*, 564 F.3d 424, 426 (6th Cir. Apr. 20, 2009) (quoting *S.E.C. v. Basic Energy & Affiliated Res., Inc.,* 273 F.3d 657, 665 (6th Cir.2001)). In *Sy v. Holder*, this Court addressed the issue of jurisdiction to review an IJ's determination concerning timeliness:

> Sy first challenges the IJ's factual finding, as affirmed by the BIA, that his
> asylum application was untimely, arguing that his testimony showed that he

> filed the application within a year of arriving in the United States. *See* 8 U.S.C. § 1158(a)(2)(B); 8 C .F.R. § 1208.4(a)(2). Congress, however, has withdrawn our authority to review this kind of contention. Under the immigration laws, we do not have jurisdiction to review a denied asylum application if the challenge turns only on claims of factual error or of abused discretion. *Almuhtaseb v. Gonzales,* 453 F.3d 743, 748 (6th Cir. 2006); *see* 8 U.S.C. § 1158(a)(3). Because Sy challenges only the factual determinations of the IJ and the BIA, his request for relief exceeds our authority to grant him relief.

*Sy v. Holder*, No. 08-3635, 2009 WL 596106, * 1 (6th Cir. Mar. 10, 2009). Here, as in *Sy*, Bary challenges the IJ's factual determination that Bary failed to prove that he filed his asylum petition within one year after arriving in the United States. We lack jurisdiction to review such a finding. 8 U.S.C. § 1158(a)(3).

## C. Fundamentally Changed Country Conditions

Bary also challenges the IJ's finding of changed country conditions in Mauritania. He argues the IJ's determination is not supported by substantial evidence. The IJ's determination that Bary failed to prove that he timely filed his application precludes Bary's asylum claim. Nevertheless, we will also examine the IJ's finding of changed country conditions with respect to Bary's asylum claim as an alternative basis for our decision.

Under § 208(a) of the Immigration and Nationality Act ("INA"), an alien may be granted asylum if he is a "refugee." 8 U.S.C. § 1158(a). A refugee is an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group,

or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). A demonstration of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The government may overcome this presumption by showing by a preponderance of the evidence that there has been "a fundamental change in the circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." 8 C.F.R. § 208.13(b)(1)(i)(A). Country Reports and Asylum Profiles may constitute substantial evidence supporting agency decisions denying asylum on the basis of fundamentally changed country conditions. *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006). Although State Department reports may be problematic sources on which to rely, they are, nonetheless, generally the best evidence available to ascertain country conditions. *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).

Here, the IJ relied upon the State Department's Profile for Mauritania. Bary argues the Profile itself undermines the IJ's finding. He refers to the following passages:

> The government's human rights record is poor; however, there were some significant improvements. At year's end the military continued to control the government, limiting citizens' ability to change their government. Other abuses included harsh prison conditions, official impunity, arbitrary arrest, prolonged pretrial detention, executive influence on the judiciary, and restrictions on freedoms of speech, press, assembly, association, and religion. There was a widespread public perception of governmental corruption and a lack of access to government information. Discrimination against women and female genital mutilation (FGM) continued. Trafficking in persons, ethnic and racial tensions, and political marginalization of largely southern-based ethnic

groups were problems. Involuntary servitude, particularly in remote regions of the country, and child labor in the informal sector occurred.

. . . .

Although the constitution and law prohibit such practices, there were reports that police beat and tortured suspects in custody, and there were instances of torture in prisons. Alleged police torture techniques included beating, hanging, burning with cigarettes, electric shock, and cutting. According to reports, those who lacked money or influential family or tribal ties were the most likely to be tortured. Authorities rarely took action against those responsible for such abuse.

. . . .

Racial and ethnic minorities faced governmental discrimination. The inconsistent issuance of national identification cards, which were required for voting, effectively disenfranchised numerous members of southern minority groups. Racial and cultural tension and discrimination also arose from the geographic and cultural divides between Moors and Afro Mauritanians.

(JA 188, 198).

After reviewing the Profile, the IJ acknowledged in his oral decision that Bary "may still face unfortunate discrimination and harassment given his race and ethnicity . . . ." (JA 126). He nevertheless concluded that "this would not put him at risk for actual persecution." (JA 126). The IJ's conclusion is not a contradiction, as this Court has also recognized that harassment and discrimination do not necessarily equate with persecution for purposes of asylum. *See Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). Furthermore, as the IJ noted, the government that had persecuted Bary was no longer in power, and there had recently been free and fair elections in Mauritania. Significantly, a substantial number of the

other refugees from the 1989 to 1991 period had returned to Mauritania, many of whom had been able to reclaim their property.

The portions of the State Department Profile upon which Bary relies paint a grim picture of human rights in Mauritania. In light of other evidence in the Profile, however, we cannot say that any reasonable adjudicator would be *compelled* to conclude that country conditions in Mauritania had not fundamentally changed since Bary left there in 1989. Accordingly, we find that substantial evidence supported the IJ's determination of changed country conditions. For this additional reason, we will not overturn the BIA's denial of Bary's application for asylum.

Lastly, Bary asserts that after the IJ and BIA denied his claims for relief, the Mauritanian military initiated a coup d'état and overthrew the civilian government. "[I]n light of the highly complex and sensitive nature of the question of changed country conditions," we allow the BIA "the opportunity to address the matter in the first intance in light of its own expertise," *Khora v. Gonzales*, 172 F. App'x 634, 639-40 (6th Cir. 2006) (internal quotation marks and citation omitted).

Bary's proper recourse, then, is to petition the BIA to reopen his case under 8 C.F.R. § 1003.2(c)(1), which allows the BIA to "reopen a closed proceeding if the petitioner includes with the petition affidavits and the information to be considered at the reopened proceeding relating to the change in conditions since the BIA originally considered the

claim." *Zeito v. Gonzales*, 152 F. App'x 496, 503 (6th Cir. 2005). The time and numerical limitations placed on motions to reopen do not apply to those based on changed country conditions. 8 C.F.R. § 1003.2(c)(3)(ii). We do not express any view as to the merits of such a petition in Bary's case.

## D. Withholding of Removal and Relief under CAT

Bary also sought withholding of removal and protection under CAT. To qualify for withholding of removal under the INA, an alien must demonstrate that it is "more likely than not" that he will be persecuted if he returns to his home country. 8 C.F.R. § 1208.16(b)(1)(B)(ii). Similarly, an alien seeking relief under CAT must prove that it is more likely than not that he will be tortured upon his return. 8 C.F.R. § 1208.16(c)(2). Since Bary cannot satisfy the standard for asylum, it follows he cannot meet the more stringent standards which govern his withholding of removal and CAT claims. *See Ndrecaj*, 522 F.3d at 677; *Sarr v. Gonzales*, 485 F.3d 354, 361-62 (6th Cir. 2007).

## V. DISPOSITION

For the foregoing reasons, we conclude that we are without jurisdiction to review the IJ's determination that Bary failed to prove that he filed his asylum application within one year after arriving in the United States. We further find that substantial evidence supports the IJ's finding of fundamentally changed country conditions. We therefore **DENY** Bary's petition for review.