NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0269n.06

No. 10-3084

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Mar 13, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JIHAD SASSINE GEAGEA, et al., | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioners, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | |

BEFORE:     KEITH, SUTTON, and MCKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**  This is an immigration case in which Lebanese citizens Jihad Sassine Geagea ("Geagea"), his wife, Nada Tanios Raji ("Raji"), and their child, Jad Jihad Geagea ("Jad") (collectively, "Petitioners") seek review of a January 7, 2010 final order from the Board of Immigration Appeals ("BIA").  In its decision, the BIA dismissed Petitioners' appeal from the immigration judge's ("IJ's") denial of Petitioners' applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") and upheld the IJ's adverse credibility finding.  The BIA also denied Petitioners' motion to remand.  We **AFFIRM**.

## I. BACKGROUND

**A. Petitioners' Initial Asylum Application**

Petitioners were admitted to the United States as nonimmigrant visitors on April 13, 2000, with authorization to remain until October 12, 2000.  A.R. 582-83; 604-05; 626-27.  On February

9, 2001, Geagea filed an asylum application listing Raji and Jad as derivative beneficiaries.  A.R.

474-82.  Geagea sought relief on the basis of religion, nationality, political opinion, membership in

a particular social group, and the CAT.  A.R. 479.  He elaborated:

> I am seeking asylum because I fear for my life and the life of my family if I were to
> return to Lebanon.  I was the bodyguard for the leader of Lebanese Christian Forces
> Samir Geagea.  Back in 1996, Lebanese government put him in jail so soon after that
> I was forced to go to South Lebanon to stay with Milia Lahad for safety.  I knew the
> only safe thing to do for me and my family was to come to the United States to visit
> with my brother and his family and my mom and dad.  While I was here, Israelis
> Forces [sic] pulled out of Lebanon and most Milia Lahad too.  I received calls and
> letters from Lebanon not to return or my life would be in great danger.

A.R. 478; A.R. 479.  Geagea's application was otherwise sparse, aside from him explaining that he

"would like the opportunity to explain [his] whole situation . . . [at his] hearing."  A.R. 479.

On December 29, 2004, the DHS filed Notices to Appear ("NTAs") to commence removal

proceedings against Petitioners pursuant to 8 U.S.C. § 1227(a)(1)(B) for overstaying their

nonimmigrant visas.  A.R. 582-83; 604-05; 626-27.  At Petitioners' master calendar hearing, A.R.

114-20,  Petitioners admitted the allegations in the NTAs, conceded the removability charge, and

requested asylum, CAT protection, and withholding of removal as their relief.  A.R. 116-17.

**B.  Petitioners' Merits Hearing**

On April 30, 2008, Petitioners appeared with counsel before an IJ for their merits hearing.[1]

A.R. 136-225.  Petitioners offered four witnesses in support of their claims: Geagea, Raji, Joe

---

[1] The four-year gap between Petitioners' master calendar hearing and their merits hearing
occurred for a variety of reasons, including: the need for Petitioners' fingerprints needed to be taken,
A.R. 119; Petitioners' request for time to update their asylum application, A.R. 128, which they filed
on July 12, 2007, A.R. 133; and a scheduling hearing, A.R. 131-34.

Geagea ("Joe"), and Elie Abdallah ("Abdallah"). *Id.; see also* A.R. 97. Only Geagea and Raji, however, provided relevant testimony; both Joe and Abdallah were in the United States at all material times, and they were unable to provide any specific information regarding either Petitioners' case or Lebanon. *See* A.R. 200-02 (Joe's testimony); A.R. 205-11 (Abdallah's testimony); Pet. Brief at 7 (effectively conceding both Joe and Abdallah's testimony as irrelevant).

    1. Geagea's Testimony

Geagea testified that he lived in Jdeideh and worked for the Lebanese Forces[2] as the bodyguard for Samir Geagea ("Samir") from 1985 until Samir was jailed by the Syrian Hezbollah. *See* A.R. 152-53; A.R. 155; A.R. 167; A.R. 169-70. Geagea repeatedly maintained that his employment with the Lebanese Forces lasted between six and seven years, and that his employment terminated upon Samir's arrest. A.R. 155; A.R. 167. Consistent with this timeline, Geagea asserted that his services with the Lebanese Forces terminated in 1991 or 1992. A.R. 168. Geagea also testified, however, that he was still working for the Lebanese Forces as late as 1994, A.R. 155, and that Samir's eleven years' imprisonment ended in 2005 or 2006. A.R. 170. When presented with these inconsistencies, Geagea backtracked, saying: "I don't remember the exact date . . . 50 percent I don't remember, because I don't memorize the dates." A.R. 170. *See also* A.R. 171.

Geagea further testified that, after Samir was jailed, he "escaped [and] went up to the mountains" in Deir al Ahmar for 15 or 20 days. A.R. 178-80. Geagea then testified that he returned to Jdeideh and worked in his father's store until leaving for the United States in 2000. A.R. 168.

---

[2]Geagea described the Lebanese Forces as a paramilitary "political and military" organization that "defend[ed] the Lebanese army" and the "Christian Lebanese in Lebanon." A.R. 165.

Geagea further alleged that during this time period the Syrian Hezbollah kidnapped him four times and tortured him because he was a Christian.  A.R. 156-57.  Geagea asserted that his longest period of arrest was approximately 11 hours, A.R. 175, but he was unable to recall any dates or even offer a detailed chronology.  *See* A.R. 158; A.R. 172-74.

Next, Geagea testified that he "used to be beaten on [his] hands," but he did not seek medical treatment because he could not afford it.  A.R. 175.  Instead, Geagea explained, he would take "one tablet of Panadol, sleep – Tylenol or Panadol and sleep for two hours."  *Id.*  Geagea admitted that he never required stitches and he never suffered a concussion or broken bones.  *Id*.

Geagea also testified that he, Raji, and Jad traveled to Syria to obtain their American visas approximately four months before traveling to the United States.  A.R. 162-64.  Geagea described his family's passage from Lebanon to Syria as seamless, enabling them to make the trip across the border and back on the same day.  A.R. 162-63.

2. Raji's Testimony

Raji testified that Geagea terminated his employment with the Lebanese Forces in 1994.  A.R. 197.  Raji further testified that Geagea was kidnapped four times after Samir was arrested.  A.R. 196.  When asked for the date of the first time Geagea was arrested, Raji offered: "I could remember the year.  It would be 1994, 1995."  *Id.*  Raji was then confronted with the fact that all of her family's asylum applications listed the date of Samir's arrest as 1996.  *Id.*  Raji replied: "My husband doesn't know — didn't memorize dates.  He was (indiscernible) too many incidents.  It could be about the same, 1994 or 1995 that Samir Geagea was arrested."  *Id.*  The following dialogue then ensued:

Q: So when your husband said — told us that he was employed by the Lebanese Forces for six to seven years, that was, in your experience, not true?
A: Six to seven years he was bodyguard for [Samir], but before that he belong to the Lebanese Forces without being a bodyguard. . . .
Q: And, ma'am, do you recall whether your husband ever departed from the family home for any length of time? . . .
A: First time when he went with Samir . . . he went for five days.
Q: He was arrested and away from the family home for five days?
A: Yes. . . .
Q: Okay. Now, ma'am, do you recall whether your husband was gone for the – gone from the family home for more than five days during your marriage on any occasion, for any reason whatsoever, whether he was arrested or for any other reason?
A. No.

A.R. 197-99.

## C. The IJ's Decision

On April 30, 2008, the IJ found that Petitioners lacked "credibility and believability and substance." A.R. 106. In particular, the IJ identified two substantial discrepancies between Geagea's and his wife's testimony as well as between Petitioners' testimony and their previously-filed asylum applications. A.R. 103. First, the IJ noted that Geagea and Raji's testimony regarding the length of Geagea's service in the Lebanese Forces was inconsistent: whereas Geagea testified that his service ended in 1991 or 1992, Raji testified that Geagea's service ended in 1994 or 1995. *Id.* Second, the IJ found that Geagea and Raji offered substantially different testimony regarding the longest amount of time that Geagea was away from home; whereas Raji testified that Geagea was never away from home for more than five days, Geagea testified that he was away from home for 15 or 20 days. *Id.* In light of these inconsistencies, the IJ rejected Petitioners' asylum claim for failure to establish past persecution. A.R. 107.

The IJ also rejected Petitioners' asylum claim because it did not demonstrate a well-founded fear of future persecution. The IJ explained that, although Geagea claimed he was detained and tortured on four occasions,"there is absolutely no detail, except with regard to one of those arrests, as to the circumstances . . . ." A.R. 105. Further, the IJ noted that Geagea only mentions one detention in his asylum application, and reasons that "if these incidents are significant enough that [Geagea] today claims that they formed the basis of his claim of past persecution that he would at least mention those incidents in his I-589 application for asylum." A.R. 106-07. Finally, the IJ rested his adverse credibility finding on the fact that Petitioners failed to "provide[] much in the way of documentation to support any of [their] claims," such as "anything in writing to corroborate [Geagea's] claims about treatment at the hands of whomever he claims detained him." A.R. 107.

Because Petitioners "failed to meet the relatively low burden required to . . . prove a claim for asylum," the IJ determined that Petitioners "necessarily failed to meet the higher burden required to prove a claim for withholding of removal . . . ." A.R. 109. Finally, the immigration judge denied Petitioners' CAT application because Petitioners "presented no evidence to suggest there is any basis to believe that they would be subjected to torture by, at the instigation of, or with the consent or acquiescence of the government of Lebanon or public official thereof." A.R. 110.

**D. The BIA's Decision**

Petitioners timely appealed the IJ's decision to the BIA on May 28, 2008. A.R. 65-74. In addition, Petitioners filed a motion for remand on September 8, 2008 in light of "recent medical information," A.R. 17, and "drastic changes in circumstances" in Lebanon. A.R. 18.

On January 7, 2010, the BIA dismissed Petitioners' appeal and denied their motion to remand.  A.R. 3-5.  With regard to the appeal, the BIA held that the inconsistencies surrounding the length of Geagea's service in the Lebanese forces, the length of Geagea's detention, and the length of time that Geagea was away from home all supported the IJ's adverse credibility finding.  A.R. 3-4. The BIA denied Petitioners' motion to remand pursuant to 8 C.F.R. § 1003.2(c)(1).  This appeal followed.

**E.  Petitioners' Instant Appeal**

Petitioners raise two grounds on appeal.  First, Petitioners argue that the BIA's decision, which relied upon the IJ's adverse credibility determination, was not supported by substantial evidence.  Second, Petitioners assert that the BIA's denial of Petitioners' motion to remand constituted an abuse of discretion.  Both are unavailing.

## II.  ANALYSIS

**A.  The BIA's Dismissal of Petitioners' Appeal is Supported By Substantial Evidence**

1. Standard of Review

Where the BIA "did not summarily affirm or adopt the IJ's reasoning and provided an explanation for its decision," as in this case, this Court "review[s] the BIA's decision as the final agency determination." *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007).  To the extent the BIA relied on the IJ's reasoning, however, this Court also reviews the IJ decision. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir.  2009).

Here, the BIA's determination largely relied upon the IJ's adverse credibility finding.  This Court reviews adverse credibility determinations for substantial evidence.  *See, e.g.*, *Mostafa v.*

*Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005); *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) ("[C]redibility determinations are considered findings of fact and are reviewed under the substantial evidence standard."). Under the substantial evidence standard, this Court upholds the BIA's determination if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); s*ee also Pergega v. Gonzales*, 417 F.3d 623, 627 (6th Cir. 2005) (explaining that this Court only reverses a credibility determination when "any reasonable adjudicator would be compelled" to reach a contrary conclusion). Because Petitioners' case was filed before the effective date of the REAL-ID Act, the Board's adverse credibility finding is supported by substantial evidence so long as it is "based on issues that go to the heart of the applicant's claim." *Ndrecai v. Mukasey*, 522 F.3d 667, 674-75 (6th Cir. 2008).

    2. The Agency's Adverse Credibility Determination is Supported by Substantial Evidence

    Petitioners contend that the Agency's adverse credibility finding is not supported by substantial evidence because it "do[es] not deal with the actual claim but instead just deal[s] with periods of time and dates." Pet. Brief at 19. Petitioners' argument, however, does not compel reversal of the BIA's determination.

    First, as the BIA explained, Petitioners' "numerous discrepancies" regarding dates and times directly implicated "the events surrounding the alleged instances of persecution." A.R. 2. Because Petitioners premised their asylum claim on Geagea's alleged persecution stemming from his employment with the Lebanese Forces, a reasonable factfinder could conclude that Petitioners' failure to provide a consistent timeline for Geagea's employment with the Lebanese forces affected

the heart of Petitioners' claim.  *Id.*  Further, as the BIA noted, Petitioners' claim was seriously weakened by their testimonial inconsistencies because they failed to provide corroborating documentary evidence to establish Geagea's dates of employment with the Lebanese Forces.  A.R. 4.  Finally, the BIA also highlighted significant discrepancies in Petitioners' case regarding central events, such as the number of times that Geagea was arrested:

> [A]lthough [Geagea] testified that he was arrested four times, he only mentioned one arrest in his [first two] asylum applications.  In fact, [Geagea's] latest application, dated 2007, does not mention any of the arrests.  Notably, [Geagea] does not address these significant omissions on appeal, and we agree with the Immigration Judge that these omissions go to the heart of the asylum claim.

A.R. 4.

Ultimately, while this Court appreciates with Petitioners' assertion that "[i]t is certainly reasonable that they could not recall the specific dates and time periods for <u>all</u> the events while they were in Lebanon," Pet.  Br.  at 19 (emphasis added), reasonableness is not the standard of review.  Both the IJ and the BIA identified numerous discrepancies in Petitioners' case that are central to the credibility of Petitioners' claim.  Because nothing in Petitioners' brief is sufficient to *compel* this Court to overturn the BIA's reasoned adverse credibility finding, this Court **AFFIRMS** the BIA's dismissal of Petitioners' appeal.

**B.  The BIA's Denial of Petitioners' Motion to Remand is not an Abuse of Discretion**

1.  <u>Standard of Review</u>

This Court reviews the BIA's denial of Petitioners' motion to remand for an abuse of discretion.  In particular, this Court considers whether the denial "was made without a rational

explanation, inexplicably departed from established policies, or rested on an impermissible basis."

*Sarr v. Gonzales*, 485 F.3d 354, 363 (6th Cir. 2007) (internal citations omitted).

    2. <u>The BIA Properly Denied Petitioners' Motion to Remand</u>

Petitioners articulate two grounds in support of their claim that the BIA abused its discretion by denying their motion to remand. Both fail.

First, "Petitioners submitted eight documents to show that country conditions significantly worsened since the time of the hearing." Pet. Brief at 25. *See also* A.R. 25-48. As the BIA explained, however, "conditions of political upheaval which affect the populace as a whole or in large part, or civil unrest between competing political factions, are generally insufficient to establish eligibility for asylum." A.R. 4-5. Because Petitioners' submission of general news articles does not constitute "material" evidence, the BIA properly rejected Petitioners' motion on this ground. *See* 8 CFR § 1003.2(c)(1) ("A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . .").

Second, Petitioners submitted a note from a Lebanese doctor who treated Geagea from 1994 to 2000 to "certify that . . . Geagea is seen [sic] . . . from May 1994 till his leaving Lebanon due to severe anxiety-depression . . . causing . . . memory troubles . . . ." A.R. 33. As the BIA found, "this evidence contains previously available information and could have been presented earlier . . . ." A.R. 4. As such, the Board also properly denied Petitioners' motion pursuant to 8 C.F.R. § 1003.2(c)(1). Consequently, we **AFFIRM** the BIA's denial of Petitioners' motion to remand.

## V. CONCLUSION

For the foregoing reasons, this panel **AFFIRMS** both the BIA's orders.