**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0435n.06

No. 08-4116

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jun 24, 2009**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ISSA SAO, | ) | |
| | ) | |
| **Petitioner,** | ) | **ON PETITION FOR REVIEW** |
| | ) | FROM THE BOARD OF |
| v. | ) | IMMIGRATION APPEALS |
| | ) | |
| ERIC H. HOLDER, JR., United States | ) | |
| Attorney General, | ) | **O P I N I O N** |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**Before: MOORE, GIBBONS, and FRIEDMAN,**[*] **Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioner Issa Sao, a native and citizen of

Mauritania, seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming the

Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and

protection under the Convention Against Torture ("CAT"). Because the evidence in the record does

not compel reversal of the determination of the BIA and IJ that Sao's testimony contained a

substantial inconsistency and that Sao failed to come forward with reasonably available

corroborating evidence, we **DENY** the petition for review.

---

[*]The Honorable Daniel M. Friedman, United States Circuit Judge for the United States Court
of Appeals for the Federal Circuit, sitting by designation.

# I. BACKGROUND

Sao is a twenty-eight-year-old citizen of Mauritania who arrived in the United States in January 2004 using a fraudulent passport. On June 8, 2004, he applied for asylum, withholding of removal, and CAT protection, claiming past persecution and a fear of future persecution on account of his race, nationality, and political opinion. On December 3, 2004, an asylum officer found Sao ineligible for asylum and referred his case to an Immigration Judge ("IJ"). The IJ held a removal hearing on November 27, 2006.

In his testimony before the IJ, Sao stated that he and his family, who are black Africans and Fulani speakers, were persecuted by White Moors, who are ethnically Arab and control the Mauritanian government and military. Sao testified that in 1990 White Moors seized part of his father's agricultural land in Mauritania. Then, in 1995, as his father was returning from a cattle drive between Mauritania and Senegal, White Moors prevented Sao's father from returning to Mauritania, forcing him to remain in Senegal for three months until he was able to reenter Mauritania without authorization.

Sao further testified that in 2000 a group of six or seven soldiers came to his family's home and demanded the family's identification cards. According to Sao, the soldiers wanted the Saos' identification cards in order to use them to cast votes for White Moor candidates in a pending election. Sao's father refused, evidently because of fears relating to the 1995 incident in which he was refused reentry into Mauritania. Sao's father was then allegedly struck on the knee with a rubber baton, handcuffed, and pushed the ground, at which point a soldier placed his foot on Sao's father's throat. When Sao attempted to help, he too was beaten with a rubber baton, handcuffed, and forced to the ground, where a soldier stepped on his neck. Sao testified that he and his father were then taken to a police station, where they were held for three months and severely mistreated and tortured.

3

For the first four days, Sao and his father were held naked in a small cell and denied food. During the three-month detention, according to Sao, both he and his father were beaten during separate interrogation sessions; they were forced to undress while cold water was poured on them and were then whipped with leather sticks; and Sao's father was burned with cigarettes on his arms, legs, and neck.

After being detained for three months, Sao testified that he and his father, now joined by his mother and sister, were driven, blindfolded and handcuffed, to the river that separates Mauritania from Senegal. There, they were placed on canoes and ferried to a village on the Senegalese side of the river where they were dropped without any documents or possessions. With the help of a Senegalese villager, Sao and his family went to Dakar, Senegal, where Sao was allegedly hospitalized for fifteen days and treated for the injuries he suffered in detention. According to Sao, he then lived in Dakar for four years, during which time he worked as a street vendor and unsuccessfully applied for asylum in Senegal. According to Sao, his uncle in Senegal paid a smuggler to obtain a fraudulent Senegalese passport and U.S. visa, and on January 10, 2004, Sao flew from Dakar to Paris and then to New York. Sao testified that he remained in touch with his family, who remain in Senegal where they live with Sao's uncle.

Following the removal hearing, the IJ issued a written decision denying Sao's claims for asylum, withholding of removal, and CAT protection. First, the IJ found that Sao's testimony was not credible. The IJ explained that Sao's testimony at the removal hearing was inconsistent with the statements Sao made during his earlier interview with the asylum officer. The IJ noted two discrepancies: (1) Sao told the asylum officer that he could not remember the airline on which he flew to the United States, but testified at the hearing that he flew Air France; and (2) Sao testified

4

at the hearing about the 1995 incident in which his father was denied reentry to Mauritania, but failed to mention this incident to the asylum officer. The IJ also found that Sao's testimony at the removal hearing was internally inconsistent. The IJ noted the following two discrepancies: (1) Sao initially testified that he had no contact with anyone in Mauritania, but later stated that he had obtained an identification document from a friend in Mauritania; and (2) Sao initially testified that he had been denied asylum in Senegal, but later stated that he never received a response to his applications. The IJ also found that Sao's admitted use of a fraudulent passport and visa further undermined his credibility.

In addition to finding Sao's testimony not credible, the IJ determined that Sao did not satisfactorily corroborate his claims with reasonably available evidence. The IJ found that Sao reasonably could have corroborated his claims of persecution with an affidavit or letter from his parents, sister, or uncle, all of whom live in safety in Senegal. The IJ also found that Sao reasonably could have provided corroborating evidence of his applications for asylum in Senegal. Sao testified at the hearing that he was unaware that such evidence would be helpful, but the IJ discounted this explanation because Sao was represented by an experienced attorney. In addition, the IJ found unreliable the principal corroborating evidence submitted by Sao—a medical certificate purporting to document Sao's stay in the Senegalese hospital. The IJ observed that the certificate was dated November 12, 2000, when Sao allegedly entered the hospital, yet says that Sao stayed at the hospital for fifteen days. The IJ noted that "if the medical certificate were accurate and reliable, medical staff could not have known how long Sao would be hospitalized and already fixed his discharge date." Joint Appendix ("J.A.") at 17 (IJ Dec. at 10).

5

Based on the adverse credibility determination and Sao's failure to provide reasonably available corroborating evidence, the IJ concluded that Sao had failed to meet his burden of proving eligibility for asylum, withholding of removal, and CAT protection. Sao appealed the IJ's decision to the BIA, which dismissed the appeal on August 13, 2008. The BIA upheld the IJ's adverse credibility determination, explaining that the IJ had identified "substantial omissions between [Sao's] testimony at his individual hearing and his testimony before the asylum officer which are indeed present in the record of proceeding and for which the respondent has failed to provide sufficient and adequate explanation on appeal." J.A. at 6 (BIA Dec. at 1). The BIA also agreed with the IJ's determination that Sao had failed to provide reasonably available corroborating evidence. On the basis of the adverse credibility ruling, the BIA dismissed Sao's appeal. Sao filed a timely petition for review of the BIA's decision.

## II. ANALYSIS

### A. Adverse Credibility Determination

Sao argues that the adverse credibility determination is not entitled to deference because the inconsistencies cited in the BIA decision are minor and do not "go to the heart of" his claim for asylum. "Where the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). However, "[w]hen the BIA does not summarily affirm or adopt the IJ's reasoning and provide[s] an explanation for its decision, we review the BIA's decision as the final agency determination." *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008) (internal quotation marks omitted) (second alteration in original). In this case, the BIA adopted only that portion of the IJ's adverse credibility determination in which the IJ identified inconsistencies

between Sao's statements during his interview with the asylum officer and his later testimony before the IJ during the removal hearing. As the government concedes, the BIA did *not* adopt either the IJ's finding that there were internal inconsistencies in Sao's testimony at the removal hearing or the IJ's finding that Sao's use of a fraudulent passport and visa to enter the country undermined his credibility. Because the BIA did not adopt these findings, they are not part of the BIA's decision and are not before this court. Accordingly, our review of the IJ's adverse credibility determination is limited to the two inconsistencies identified by the IJ that were adopted by the BIA: (1) the inconsistency between Sao's testimony before the IJ that he flew Air France to the United States and his earlier statement to the asylum officer that he could not remember which airline he flew; and (2) the inconsistency between Sao's testimony before the IJ about the 1995 incident in which his father was denied reentry to Mauritania and his earlier failure to mention this incident to the asylum officer.

"Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). "Under that standard, findings of fact are treated as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Liti v. Gonzales*, 411 F.3d 631, 636 (6th Cir. 2005) (quoting *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004)). Although "'an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency.'" *Id.* at 637 (quoting *Sylla*, 388 F.3d at 926). We have further stated that though adverse credibility determinations cannot be based upon "irrelevant inconsistencies," "discrepancies may be relevant if they can be viewed as attempts by the applicant

to enhance his claims of persecution." *Ndrecaj v. Mukasey*, 522 F.3d 667, 674-75 (6th Cir. 2008) (internal quotation marks omitted).[1]

The first discrepancy identified by the IJ was that Sao told the asylum officer that he could not remember which airline he had flown to the United States but later testified at the removal hearing that he had flown Air France. The IJ observed that "Sao had no explanation why he forgot the name of the airline to tell the Asylum Officer, yet remembered it for purposes of his asylum hearing." J.A. at 12 (IJ Dec. at 5). The IJ did not explain how this discrepancy went to the heart of Sao's asylum claim. The government contends that Sao "alter[ed] his testimony about his entry into the United States" in order "to remedy the defect [of lack of detail] in his testimony before the asylum officer," and notes the lack of corroboration of his travel claims. Gov't Br. at 16. However, nothing in the record suggests that Sao provided contradictory accounts of his basic travel path from Mauritania, via Senegal, to the United States or that Sao testified inconsistently as to the date of his arrival in the United States. Instead, this discrepancy involves only the name of the particular airline that Sao flew to the United States. Absent special circumstances, we cannot see how the name of the airline flown by an asylum applicant to the United States could possibly enhance an applicant's claim of past persecution. Accordingly, we have serious doubts about whether this minor discrepancy can reasonably be "viewed as [an] attempt[] by [Sao] to enhance his claims of persecution" such that it goes to the heart of Sao's asylum claim. *Ndrecaj*, 522 F.3d at 674-75.

---

[1]The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, amended 8 U.S.C. § 1158(b)(1)(B)(iii) to state that a trier of fact may make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); *see Amir v. Gonzalez*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). This change applies only to asylum applicants who file on or after May 11, 2005. Because Sao applied for asylum on June 8, 2004, the change does not apply here, and the adverse credibility finding must be based on issues that go to the heart of his claim.

The other inconsistency cited by the IJ in support of its adverse credibility determination (and adopted by the BIA) is far more substantial. Sao testified at his removal hearing that his father was denied reentry to Mauritania in 1995, but Sao failed to mention this incident in his interview with the asylum officer. "Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." *Liti*, 411 F.3d at 637. However, we have "exercise[d] extra care in evaluating omissions from asylum applications" because of the "difficulties asylum seekers face in providing exhaustive accounts in asylum applications," *Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005), and we believe that this cautious approach should also apply when evaluating omissions in interviews with asylum officers. As we have explained, "'the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and . . . holding applicants to such a standard is not only unrealistic but also unfair.'" *Liti*, 411 F.3d at 638 (quoting *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003)).

We believe that this omission goes to the heart of Sao's asylum claim. Sao's assertion at his hearing that his father was denied reentry to Mauritania in 1995 enhanced his claim of persecution by suggesting that his family had a history of persecution by White Moors and by providing crucial context for the events of 2000. Sao testified at his hearing that in 1995 his father had crossed to Senegal during a cattle drive and was denied reentry to Mauritania by White Moors at the border, forcing Sao's father to remain in Senegal for three months. Sao further testified that this 1995 incident was connected to the events of 2000 in which he and his father were detained and beaten. According to Sao, when soldiers came to his family's home in 2000 and demanded the family's identification cards, his father refused because of fears stemming from the 1995 incident. This

9

refusal to comply with the soldiers' demands led directly to the detention and beatings suffered by Sao and his father. Sao's account of the events of 1995, therefore, provides important support and context for his claim of persecution in 2000. Without the prior denial to his father of reentry to Mauritania by White Moors in 1995, there is no explanation (in the record) for why Sao's father was so steadfast in his refusal to provide the family's identification cards to the soldiers in 2000. This crucial background fact provides the explanation: Sao's father feared that if the family's identification cards were taken, they could be deported from Mauritania and denied reentry because they lacked identification cards, as he had been in 1995. Because we believe this inconsistency by earlier omission goes to the heart of Sao's asylum claim, we conclude that it could serve as a proper basis for the IJ's adverse credibility determination.

Although this one inconsistency by earlier omission, standing alone, would likely be insufficient to support the IJ's adverse credibility finding, our decision in this case rests on the combined effect of the problem with Sao's testimony and Sao's failure to provide reasonably available corroborating evidence. *See, e.g.*, *Xue Rong Zheng v. Holder*, 315 F. App'x 570 (6th Cir. 2009) (unpublished) (upholding adverse credibility finding based upon a lack of corroborating evidence combined with inconsistencies in testimony). The BIA agreed with the IJ's finding that Sao failed to provide reasonably available corroborating evidence, and the BIA's decision provided no additional analysis. Accordingly, we review the IJ's decision on this point as the final agency decision. *See Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008). We must uphold a finding by the IJ regarding the availability of corroborating evidence unless we find "that a reasonable trier of

fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).[2]

We can find nothing in the record that compels reversal of the IJ's finding that Sao failed to present reasonably available corroborating evidence. "While recognizing that corroboration is not required, we have also stated that even if the applicant is credible, '[t]he absence of [reasonably available] corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.'" *Liti*, 411 F.3d at 640 (quoting *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004)) (alterations in *Liti*). As the IJ explained, it was reasonable to expect Sao to corroborate his testimony by providing affidavits or letters from family members who were familiar with the events described by Sao. Sao's parents and sister remain in Senegal, where they live with his uncle. Sao testified that he remained in contact with his family and called them from time to time. Given the relative safety of his family's domicile in Senegal and the fact that Sao remained in touch with his family, it was reasonable for the IJ to expect Sao to obtain affidavits or letters from family members. Indeed, Sao testified that his sister sent from Senegal a medical certificate purporting to document Sao's stay in a Senegalese hospital. Furthermore, the IJ properly determined that Sao failed to explain satisfactorily his failure to support his claim with affidavits or letters from family members. When asked during the removal hearing why he had failed to do so, Sao replied that he "didn't know that would help." J.A. at 159 (Removal Hr'g Tr. at 60). The IJ reasonably found that Sao's explanation

---

[2]A provision of the Real ID Act amended 8 U.S.C. § 1252(b)(4) to add this new standard of review. Real ID Act of 2005, Pub. L. No. 109-13, § 101(e), 119 Stat. 231, 305 (2005). As we have explained elsewhere, "[t]his provision applies even to petitions, such as this one, where the BIA acted prior to the enactment of the legislation." *Shkabari v. Gonzales*, 427 F.3d 324, 331 n.2 (6th Cir. 2005) (citing Real ID Act § 101(h)(3), 119 Stat. at 305-06).

was "not credible, especially given the fact that he was represented by an experienced attorney." J.A. at 16 (IJ Dec. at 9).

We also believe that the IJ reasonably expected Sao to corroborate his testimony by providing some documentation of his applications for asylum in Senegal. Sao testified that he submitted an asylum application in Senegal three times but never received a response. Although we do not agree with the IJ that it is reasonable to expect that Sao should have kept a copy of the application with him as he made his way to the United States, Sao has family members still living in Senegal who could at least have attempted to obtain copies of Sao's asylum records on Sao's behalf. Sao evidently made no effort to obtain this documentation and offered no explanation for his failure to do so. Instead, he simply testified that he kept no copies of the applications. For these reasons, we cannot say that the IJ was compelled to conclude that Sao's applications for asylum in Senegal were unavailable.

In addition to finding that Sao reasonably could have provided such corroborating evidence, the IJ found inconsistencies in the limited documentary evidence that Sao did put in the record. First, the IJ found an inconsistency in Sao's submission of a school identification card that was issued in 1999. Sao testified that he obtained this card from an unidentified "family member who left from the village" and "br[ought] that to us." J.A. at 169 (Removal Hr'g Tr. at 70). The IJ found an inconsistency because Sao had also testified that a friend of his father's had possession of the family's identification cards in 2000 when soldiers came to the Saos' house and demanded their identification cards. However, nothing in the record indicates whether Sao's school identification card was among the identification cards that Sao's father had given to his friend for safekeeping. Even if it had been among those cards, it is possible that the family member subsequently obtained

12

the card from Sao's father's friend and then brought it to the Saos in Senegal. Accordingly, we believe that the record does not support the IJ's finding of an inconsistency as to this document.

We believe, however, that it was reasonable for the IJ to discount the sole documentary evidence offered by Sao directly relevant to his claim of persecution—a medical certificate purporting to document Sao's fifteen-day stay in a Senegalese hospital following his forced expulsion from Mauritania. The English translation of this document, dated November 12, 2000, states that Sao's injuries "required that the patient be monitored in the hospital for fifteen (15) additional days in order to treat possible complications." J.A. at 187 (Medical Certificate, English Translation). Noting that the certificate was "dated the same day that Sao entered the hospital, November 12, 2000," and "[y]et it reports that Sao stayed there 15 days," the IJ reasoned that "if the medical certificate were accurate and reliable, medical staff could not have known how long Sao would be hospitalized and already fixed his discharge date." J.A. at 17 (IJ Dec. at 10). Given this discrepancy, we cannot say that the evidence compels a conclusion contrary to the IJ's finding that this medical certificate was unreliable.

Separately, Sao contends that in making the adverse credibility finding, the IJ somehow failed to take into consideration the fact that Sao was testifying through an interpreter and that the IJ appeared via videoconference. We first note that Sao never complained at the hearing that he was prejudiced by the IJ's appearance by videoconference or by the fact that he testified through a translator; he raised this argument for the first time in his appeal to the BIA. The BIA rejected Sao's arguments, explaining that Sao had "failed to articulate, in any meaningful way, what particular 'obstacles [were] created by tele-video and the use of a translator' or how the video conferencing and the use of the Fulani translator would have adequately explained" the inconsistency by omission

13

between his statements to the asylum officer and his testimony at his removal hearing. J.A. at 6 (BIA Dec. at 1). We agree with the BIA that Sao has failed to identify any specific problems he encountered during his removal hearing because of the fact that the IJ appeared by videoconference or because of the Fulani translator. As the BIA noted, Department of Justice regulations allow an immigration judge to "conduct hearings through video conference to the same extent as he or she may conduct hearings in person." 8 C.F.R. § 1003.25(c). As to Sao's vague contention that he faced "obstacles" because he testified through an interpreter, Sao has not alleged that the translation at the hearing was inadequate, much less shown how specific inconsistencies identified by the IJ were attributable to errors in translation. *See Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005). Accordingly, Sao's contention that the IJ should have considered the effects of holding the hearing via videoconference and with the help of a translator provides no basis for reversing the adverse credibility finding.

In sum, because the record does not compel a finding that Sao is credible and because Sao failed to come forward with reasonably available evidence to corroborate his claim, he has not met his burden to prove eligibility for asylum. Because Sao failed to establish eligibility for asylum, he necessarily cannot meet the "more stringent standard" for withholding of removal. *See Liti*, 411 F.3d at 641 (internal quotation marks omitted). Because no credible evidence in the record demonstrates that Sao "'more likely than not . . . would be tortured if removed to" Mauritania, *id.* (quoting 8 C.F.R. § 1208.16(c)(2)), Sao also cannot obtain relief under CAT.

14

**B. New Evidence of Country Conditions in Mauritania**

Sao also argues that we should remand this case based upon new evidence of country conditions in Mauritania. However, we lack statutory authority to remand for the taking of additional evidence. 8 U.S.C. § 1252(a)(1) ("Judicial review of a final order of removal . . . is governed only by chapter 158 of Title 28, except . . . that the court may not order the taking of additional evidence under section 2347(c) of Title 28."); *see also Pickering v. Gonzales*, 465 F.3d 263, 270-71 (6th Cir. 2006). As the government points out in its brief, "[i]f Sao wishes to present a new asylum claim based on new evidence, then his proper recourse is to file a motion to reopen with the [BIA]." Gov't Br. at 19. Although a motion to reopen must generally be filed no later than ninety days after a final administrative order of removal, 8 C.F.R. § 1003.2(c)(2), that time limitation does not apply to a motion to reopen an asylum application "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing," *id.* § 1003.2(c)(3)(ii). *See Barry v. Mukasey*, 524 F.3d 721, 723 (6th Cir. 2008) ("The 90-day period for filing a motion to reopen is subject to narrow exceptions: (1) where the BIA reopens the proceedings *sua sponte*; (2) where the parties agree to reopen the proceedings; (3) changed circumstances in the country of nationality of which there is new, material evidence that could not have been discovered or presented at the time of the original proceeding; and (4) certain *in absentia* decisions." (internal quotation marks omitted)).

### III. CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.

15